ATTORNEY GENERAL *vs.* JOSEPH C. PELLETIER.

December 19, 20, 1921. — January 3, 1922.

Present: RUGG, C. J., BRALEY, DE COURCY, CARROLL, & JENNEY, JJ.

December 27, 1921 – January 24, 1922. — February 21, 1922.

Present: RUGG, C. J., BRALEY, DE COURCY, CARROLL, & JENNEY, JJ.

*District Attorney. Public Officer. Supreme Judicial Court. Constitutional Law,* Removal of district attorney. *Elections. Jurisdiction. Jury and Jurors. Practice, Civil,* Waiver by failure to argue contention, Information under G. L. c. 211, § 4, for removal of district attorney, Election, Exceptions, Deposition. *Pleading, Civil,* Alternative allegations. *Witness,* Deposition, Privilege, Impeachment, Absence of witness. *Detective. Evidence,* Competency, Of conviction, Admissions and confessions, Failure to testify, Failure to call witness. *Words,* "Officer . . . of the Commonwealth," "Property," "Estate," "Immunity," "Liberty," "Conviction."

Since a district attorney, while he is an officer performing strictly public functions, is not an officer elected by the people at large and his office is not one created or provided for in the Constitution, he does not come within the classification of officers removable only by impeachment under the provisions of § 3, art. 6 and § 2, art. 8 of c. 1 of the Constitution.

The provisions of G. L. c. 211, § 4, in no way violate the provisions of art. 9 of the Declaration of Rights.

Neither art. 9 of the Declaration of Rights nor any other provision of the Constitution assures to any officer the right to remain in office after his continuing so to do has been determined by a court, acting in conformity to the provisions of a general statute, to be contrary to the public welfare.

The provisions of G. L. c. 211, § 4, in no way violate art. 10 of the Declaration of Rights, that statute being one of the "standing laws" and affecting neither the life, liberty nor property of any officer therein named.

The office of district attorney is neither "property" nor "estate" nor "immunity" nor "liberty" within the meaning of those words as used in art. 12 of the Declaration of Rights.

The provisions of G. L. c. 211, § 4, expressly or by necessary implication afford to an officer against whom the proceeding therein described is brought

the protection of judicial process, adequate notice, a statement of charges, a fair hearing, even though the hearing may be summary in appropriate circumstances, and assurance that final judgment of ouster shall not be rendered except for a sufficient cause founded upon considerations springing solely from the requirements of the public good ascertained and determined in accordance with procedure of established courts.

Even if the office of district attorney be regarded as a "privilege" as that word is used in art. 12 of the Declaration of Rights, a removal from that office under G. L. c. 211, § 4, is not violative of the provisions of that article, it being a removal according to "the law of the land."

The provisions of G. L. c. 211, § 4, confer the power and impose the duty of hearing and adjudicating as to the matters therein described upon the Justices of the Supreme Judicial Court sitting as a court.

The subject matter of G. L. c. 211, § 4, is proper for judicial inquiry.

Neither art. 30 of the Declaration of Rights nor c. 6, art. 2 of the Constitution of the Commonwealth is violated by G. L. c. 211, § 4.

The relation established between one who has been elected to and has accepted the office of district attorney and the district which elected him is not contractual.

The method of removal of a district attorney established by G. L. c. 211, § 4, entered into the texture of that office, constituted a part of its tenure and its limitation, and was one of its characteristics under the laws of the Commonwealth; and one who has accepted the office so constituted cannot complain of its limitations so established.

In the dual system of government existing under the Constitution of the United States, it is a fundamental attribute of a State that it may establish its own officers and provide for their election, selection, appointment and removal according to its own conceptions of what its public policy demands.

No argument, oral or in writing, was addressed to the court in support of a suggestion in a "motion to dismiss and plea to the jurisdiction," filed by the respondent in a proceeding under G. L. c. 211, § 4, for the removal of a district attorney, that the respondent was denied the equal protection of the laws by the statute. The respondent stated that he waived nothing. *Held,* that, under the settled practice of this court, the suggestion was waived.

The classification by the General Court of the officers who should be within the purview of G. L. c. 211, § 4, is reasonable.

A district attorney is not by G. L. c. 211, § 4, denied the equal protection of the laws.

In a proceeding under G. L. c. 211, § 4, for the removal of a district attorney, no question of jurisdiction under the Federal Constitution is involved.

A statute will not be declared void unless it is impossible by any reasonable construction to interpret its provisions in harmony with the Constitution.

Before proceeding to judgment in a proceeding under G. L. c. 211, § 4, it was the duty of this court of its own motion to satisfy itself as to its own jurisdiction.

The constitutionality of G. L. c. 211, § 4, and the jurisdiction of this court to act under it are firmly established. Following *Attorney General* v. *Tufts,* 239 Mass. 458.

In a proceeding under G. L. c. 211, § 4, seeking the removal of a district attorney who had been five times elected to successive terms in that office, the scope of the inquiry is not limited to acts committed since his last election.

An information, filed by the Attorney General under G. L. c. 211, § 4, and stating grounds which are alleged to require the removal of a district attorney, is not a criminal proceeding.

The removal of a district attorney from office under G. L. c. 211, § 4, is not a penalty inflicted upon the officer but is designed to protect the public from a corrupt, a dishonest, a dishonorable, an inefficient or an incapacitated public officer.

A proceeding under G. L. c. 211, § 4, is not an impeachment.

No trial by jury is required in a proceeding for the removal of a district attorney under G. L. c. 211, § 4.

In a proceeding under G. L. c. 211, § 4, for the removal of a district attorney, depositions may be taken within and without the Commonwealth in conformity to the statutes and the rules of court and may be offered in evidence by the informant.

A group of five paragraphs in an information filed by the Attorney General under G. L. c. 211, § 4, seeking the removal of a district attorney, charged the respondent with being a party to a conspiracy to extort money from divers persons by abuse of his power as district attorney and concluded with a paragraph charging that the respondent, with respect to the alleged conspiracy "was guilty of malfeasance, misfeasance, and nonfeasance in his said office in that he did either permit and promote the making of groundless threats of criminal prosecution against divers persons . . . or else, having at hand or available by reasonable effort sufficient evidence for the proper prosecution of criminal charges against such persons, did from improper motives fail to prosecute said charges, whereby he did either wilfully abuse the authority of his said office or did wilfully fail to discharge the duties thereof." During the taking of evidence at the hearing, the respondent moved that either the concluding paragraph of the group be stricken from the information on the ground that it contained alternative, hypothetical or disjunctive averments, or that the informant be ordered to elect upon which of the allegations therein contained he would rely. *Held,* that

(1) The proceeding being civil and not criminal, the rules of civil pleading were applicable;

(2) The charge in the information in its essence was single and was that the public good required the removal of the respondent, for which malfeasance, misfeasance and nonfeasance in office were the sufficient causes; the alternative averments were ancillary to that main charge and related to matters difficult of ascertainment in advance of a final decision on the merits;

(3) The meaning and intent of the group of charges was plain and the respondent could not have been misled or in doubt concerning the charges there set out or the defences thereto justly open to him;

(4) The pleading followed the analogy in G. L. c. 231, § 7, cl. 4; § 37, relating to alternative allegations in actions at law;

(5) The paragraph should not be stricken from the information;

(6) The informant should not be required to elect as between the alternative averments;

(7) The motion, whether treated as made during the hearing or at the close of the evidence, must be denied.

In a proceeding under G. L. c. 211, § 4, no exception can be entertained.

The provisions of G. L. c. 147, § 28, afford no privilege to an employee of a person licensed as a private detective when he is summoned as a witness in a judicial proceeding.

It is not violative of the secrecy of grand jury proceedings or of that part of the grand jurors' oath as embodied in G. L. c. 277, § 5, which requires him "the Commonwealth's counsel, your fellows and your own" to "keep secret," for a member of a grand jury, at the hearing of a proceeding under G. L. c. 211, § 4, for the removal of a district attorney, to testify in substance that an assistant district attorney while the jury were deliberating and before they voted, after the witnesses had closed their testimony, told the grand jury that one against whom an inquiry was being conducted by the grand jury was a brother of one of the assistant district attorneys, and also discussed with the grand jurors the evidence presented to them.

It is improper for a district attorney before a grand jury to state any facts which have no relevancy to the guilt or innocence of the particular person under inquiry, but which may have a tendency to influence the action of the grand jury on other grounds.

When conduct of the district attorney with the grand jury is plainly outside the sphere of his duty, his counsel is not "the Commonwealth's counsel" as those words are used in the oath of a grand juror, G. L. c. 277, § 5, and such conduct does not come within the protection of that part of the oath which relates to the secrecy of grand jury proceedings.

It is a perversion of grand jury proceedings for the evidence in a number of cases, varying according to the length of the individual cases, to be presented for the jury's hearing before they vote or act upon any one of them, and then, previous to their taking up the individual cases for voting upon them, for the district attorney or his assistant to give to them an outline of the evidence and to refresh their memory by summarizing briefly the facts in each case.

While a district attorney has no right to stay with the grand jury during their deliberations and must withdraw on their request, nevertheless he may remain by their permission and his presence does not invalidate their proceedings; but he must keep silent unless his advice or opinion on a matter of law is sought, and he should not participate in the deliberations nor express an opinion on a question of fact, even if asked so to do, nor attempt in any way to influence the actions of the grand jurors.

At the hearing of an information filed under G. L. c. 211, § 4, for the removal of a district attorney, a conviction of crime in the District Court of the United States for the Southern District of New York may be shown under G. L. c. 233, § 21, to affect the credibility of a witness, provided the record comes within the terms of the statute.

Whether a record offered to prove such a conviction is a record of a final judgment, is a question of federal practice.

Documents, presented under G. L. c. 233, § 21, in December, 1921, to prove the conviction of a witness of a crime in the District Court of the United States for the Southern District of New York, showed a verdict of guilty and a sentence, presentation of a writ of error to the United States Circuit Court of Appeals, mandate from that court affirming the judgment of the District Court, an order and decree of the District Court making such mandate its judgment with an order that the respondent surrender himself into the control of the United States marshal on or before August 8, 1921, and an order to that marshal to deliver him over for imprisonment in accordance with the sentence, an order for a stay until October 10, 1921, and a certificate of the clerk of the United States Supreme Court that a petition for a writ of certiorari had been denied by

that court on October 24, 1921. *Held,* that the record proffered was of a final judgment.

At the hearing of an information by the Attorney General under G. L. c. 211, § 4, seeking the removal of the District Attorney of the Suffolk District, in several instances the Attorney General was permitted to introduce evidence of declarations of a person or of persons charged by him with being a co-conspirator with the respondent in conduct, specifically described, involving a misuse of the respondent's office. The Attorney General in each such instance promised that evidence warranting a finding of the existence of such a conspiracy would be produced, and such evidence was produced. At the close of the evidence the respondent moved that "all the testimony given by the various witnesses as to acts and declarations of persons other than the respondent, which were not done or made in the presence of the respondent, or by his direction, be stricken from the record," accompanying the motion with specifications. *Held,* that

(1) It could not be ruled as matter of law in any case that there was not evidence tending to show and warranting as matter of law a finding that a conspiracy existed as charged;

(2) The order of introducing the evidence was discretionary with the court;

(3) Where there is evidence of a conspiracy, the acts and declarations of each conspirator in pursuance of the common design, whether in the presence or in the absence of the fellow conspirators, are admissible against all;

(4) There being evidence as a matter of law sufficient to warrant a finding that the alleged conspiracies existed, the respondent's motion to strike out must be denied.

Included in the specifications of evidence which formed a part of the motion of the respondent to strike out certain evidence, above described, was evidence concerning financial transactions between the respondent and a member of the bar, alleged to be a co-conspirator with the respondent in misuse of his office, who was a close personal, social, professional and political friend of the respondent. The evidence related to withdrawals by the alleged co-conspirator of large sums of money from his bank accounts, or the possessing by him or his agents of large sums of cash in bills, and the deposit soon after by the respondent of similar amounts in bills to his credit in his bank account. The sums deposited by the respondent varied in amount from $1,000 to $5,000 and were reasonably near in point of time to the receipt by the alleged co-conspirator, in connection with cases named in the information, of sums of money largely in excess of any amount justly due for legitimate services rendered by him or for any just claims due to or from his clients. There also was evidence tending to show that the respondent and the alleged co-conspirator were conspirators to exert the power of the district attorney to extort money, to terrorize people into surrendering causes of action and otherwise to abuse that office. *Held,* that the evidence was competent and should not be stricken out.

The threat to bring or the actual bringing of a civil action from whatever motive and without probable cause is not a crime at common law; it is only by express statutory provision that such conduct becomes criminal.

A district attorney has no right by virtue of his office to interfere in civil litigation between private parties for the purpose of compelling a surrender of a civil right or the abandonment of a civil action, the prosecution of which has not been made criminal by statute.

In a paragraph in the information seeking the removal of the District Attorney for the Suffolk District, above described, it was charged that the respondent, "having sufficient evidence in his possession or available by reasonable effort, has from improper motives failed to prosecute or cause to be prosecuted by his assistants persons who have committed crime within his jurisdiction." While some of the specifications under this charge were being tried, the informant offered evidence tending to show that the respondent engaged in a conspiracy to accomplish that end, although there was no charge to that effect in the particular paragraph or specification. *Held,* that

(1) The evidence was competent although its tendency was to establish the commission by the respondent of another wrong in addition to that charged;

(2) Upon the confederacy in a common wrongful enterprise being established, the acts and words of the co-conspirators directed toward the furtherance of the common purpose were competent.

In reply to an intimation in the argument of one of the counsel for the respondent at the hearing of the information above described, that vicious influences and unreasoning prejudice instigated its prosecution, it was *found* that there was not a shadow of basis for such suggestion, and that it was not supported by a shred of evidence.

At the hearing of the information above described, there was ample evidence introduced by the informant tending to prove that the respondent was guilty of many of the charges set forth in the information, which, if believed, constituted abundant proof of malfeasance and misfeasance in office arising from motives utterly unworthy of an upright man. The respondent did not testify nor call any witnesses. *Held,* that

(1) Refusal to testify or to call available witnesses in his own behalf in such circumstances warranted inferences unfavorable to the respondent;

(2) The constitutional protections against the drawing of presumptions adverse to a defendant from his failure to testify, which apply only to criminal cases, were utterly irrelevant to the proceeding under G. L. c. 211, § 4, and did not aid the respondent;

(3) The principle, that in civil causes no unfavorable inferences can be drawn against one who fails to testify or to offer evidence when no case has been made out against him, did not apply, there having been much evidence introduced by the informant which supported the allegations of the informant-and which called for explanation.

After a hearing upon its merits of the information by the Attorney General seeking the removal of the District Attorney for the Suffolk District, above described, and having invoked in favor of the respondent every presumption of uprightness, rectitude and innocence which commonly characterize the conduct of men in public station, this court made the following findings:

(1) Charges, that the respondent in September and October, 1916, conspired with a certain member of the bar, who is referred to above as the respondent's close personal, social, professional and political friend, and others to extort money from the Emerson Motors Company, or persons engaged in promoting that company, by threats of criminal prosecution, and that, to prevent such prosecution, the sum of $20,500 was paid to the member of the bar, and that the respondent thus was guilty of malfeasance, misfeasance and nonfeasance in office either by making groundless threats of criminal prosecution or by failing to prosecute just criminal charges, all from improper motives; and that in the

same matter the respondent knowingly permitted divers persons to use the authority of his office for the purpose of coercing others to settle civil claims or to give up money or property or both and knowingly aided and abetted persons to extort or to attempt to extort money or property from other persons by threats of criminal prosecutions, were sustained;

(2) Similar charges relative to a conspiracy in November, 1916, of the respondent with the same member of the bar and others to extort from one Daniel, a dealer in securities and a promoter of the Metropolitan Motors, Incorporated, a large sum of money by threats of criminal prosecution, were sustained; and, it having been established that the conspiracy had existed and that in furtherance thereof a false representation that criminal proceedings against the promoter were pending was made with intent to extort money, it was immaterial whether an investigation was undertaken against the promoter and the corporation, that the conspiracy was unsuccessful, that no money was paid to the conspirators and that nothing more was heard of criminal proceedings in the matter;

(3) Charges that the respondent in March, 1918, conspired with the same member of the bar and aided and abetted him to frighten one Dorothy Coté by threats of criminal prosecution to abandon a civil action brought by her against a corporation for the conversion of an automobile in the corporation's possession which she asserted was given to her by a married man with whom she had been on terms of intimacy and which the corporation refused to deliver because the man claimed it as his own, that thereby the respondent knowingly permitted the co-conspirator to use the authority of the respondent's office for the purpose of coercing the settlement of that civil claim and to give up property and knowingly aided and abetted the co-conspirator to extort and to attempt to extort property from Dorothy Coté by threats of criminal prosecution, were sustained; and, it having been established that the conspiracy existed and that the main and dominating cause for the conduct of Dorothy Coté in giving up her civil claim was the threat of criminal prosecution made by the respondent pursuant to the conspiracy, the existence of an ancillary motive contributing in part to the same result, consisting of a hope on Dorothy Coté's part for a reconciliation with the man who was claiming ownership of the automobile, which hope later was realized in her subsequent marriage to him, did not affect the legal aspects of the conduct of the respondent;

(4) Charges that the respondent from October, 1915, to April, 1919, conspired with the member of the bar above described and with the then District Attorney for the Northern District and others to extort money from an unoffending old woman, her daughter and her daughter's husband and by the use and abuse of the powers of his office to accomplish that result, and that the respondent from improper motives had procured an indictment against the daughter's husband, a lawyer and a detective whom he had employed, which ought not to have been procured, were sustained, it being found that, through the conspiracy, the processes of law, which are designed to defend the innocent and to protect society against the wrongs of the criminal, had been used as instruments of oppression in an attempt to wrest money from the blameless and aged;

(5) The respondent in 1917, by threatening one Piscopo that he would be a victim of the official power of the district attorney's office if he did not pay a professional associate of the respondent a certain fee for services which in the circumstances was found to be exorbitant and which the respondent was to and

did share, baldly used his official power to extort money for his own financial enrichment;

(6) The respondent in 1916 threatened one Peters with criminal prosecution because of some improper relations with a married woman, advised him to see the member of the bar, described above as a co-conspirator, and settle the matter with him; when settlement was not made procured an indictment and, upon a settlement thereupon being made, snuffed out the indictment;

(7) The respondent in 1916 and 1917 consciously used the powers of his office through threats of criminal prosecutions to aid the member of the bar, described above as a co-conspirator, and others to extort large sums of money from one Berman, associated with others in the maintenance of a second class hotel;

(8) The respondent in 1916 used the powers of his official position to coerce one Buckley, through threat of a criminal prosecution, into surrendering a civil claim for damages against certain clients of the member of the bar, described above as a co-conspirator;

(9) The relations between the respondent and the member of the bar, described above as a co-conspirator, properly were considered on any charge against the respondent to which they were relevant;

(10) The respondent in December, 1919, from improper motives and because of sinister influences brought to bear upon him, nolprossed a complaint which was in the Superior Court upon an appeal from a municipal court and as to which there was abundant and convincing evidence that the defendant therein grossly insulted and seriously assaulted a virtuous and honest working woman at eleven o'clock on a night in April, 1916, on Warren Bridge in Boston as she was returning from a church entertainment in the city, and that the defendant showed no penitence whatever for his crime;

(11) Within a month after the filing of the information containing the charges upon which the foregoing findings were made, the respondent in a public speech at a meeting relating to his candidacy for mayor of the city of Boston, in seriousness incited to the commission of crime and promised immunity from criminal prosecution, in words substantially as follows: "There is a dirty low-down propaganda going throughout the city that I am going to withdraw. Tell the man who tells you that that he is wrong. If he persists, tell him he's a liar. Back it up and I will nolpros your case. . . . I am not making any cheap political speech, I am giving you facts;"

(12) The foregoing findings made clear beyond doubt that the respondent was unfit longer to hold the office of district attorney.

On February 21, 1922, in the proceedings above described, the respondent was removed from office.

INFORMATION, filed by the Attorney General on October 27, 1921, under G. L. c. 211, § 4, and supported by affidavits of the Attorney General, of Henry N. Sheldon, Esquire, and of Albert Hurwitz, Assistant Attorney General, containing allegations which, as amplified by specifications afterwards filed, were in substance as follows:

Joseph C. Pelletier, the respondent, on November 2, 1909, was

elected a District Attorney for the Suffolk District and qualified as such on November 13, 1909, to serve out the unexpired term of John B. Moran, deceased. He was elected again to that office on November 8, 1910, and qualified on January 2, 1911, and thereafter continued in that office and on the date of the filing of the information was holding the office by election thereto and qualification therein for successive terms, having been last elected on November 4, 1919, and having last qualified therein on January 8, 1920. From that office the informant alleged that the respondent should be removed and in support of that allegation he set forth acts and doings of the respondent since November 13, 1909, which were relied on by the informant as showing the respondent to have been guilty of malfeasance, misfeasance, and nonfeasance in his office, as having conducted himself in his office in an unlawful and reprehensible manner and to be an unfit person to hold that office, so that the public good required his removal; and the specifications of such unfitness, malfeasance, misfeasance and nonfeasance, which were relied upon at the hearing on the merits, were as follows:

1. In or about September, 1916, the respondent conspired with one Daniel H. Coakley, a member of the bar of this Commonwealth, and other persons, to extort from the Emerson Motors Company, or from divers persons engaged in promoting that company, or from both such persons and the company, a large sum of money by threats of criminal prosecution.

2. In or about September, 1916, the respondent did permit and promote the making of threats of criminal prosecution against the Emerson Motors Company and against divers persons engaged in promoting that company, and such persons in fear of the criminal prosecutions so threatened did pay out or procure to be paid out large and divers sums of money, to wit: $20,500, to Daniel H. Coakley in order to procure the discontinuance and abandonment of the criminal prosecutions; and the respondent did thereupon discontinue and abandon the criminal prosecutions, whereby he did wilfully and unlawfully abuse the authority of his office and knowingly did permit the same to be made the instrument of fraud and extortion.

3. In or about September, 1916, the respondent conspired with Daniel H. Coakley and other persons to extort from the

Emerson Motors Company or from divers persons engaged in promoting that company, or from both together, a large sum of money by threats of criminal prosecution, and the respondent, pursuant to such conspiracy, did permit and promote the making of threats of criminal prosecution against those persons, and they, in fear of the criminal prosecutions so threatened did pay out, or procure to be paid out, large and divers sums of money, to wit: $20,500, to Daniel H. Coakley in order to procure the discontinuance or abandonment of the criminal prosecutions, which prosecutions the respondent did thereupon discontinue pursuant to the conspiracy, whereby the respondent did wilfully and unlawfully abuse the authority of his office and did permit it to be made the instrument of fraud and extortion.

4. In or about September, 1916, the respondent corruptly aided and abetted Daniel H. Coakley and other persons to obtain from the Emerson Motors Company or from divers persons engaged in promoting it, or from both together, a large sum of money, to wit: $20,500, by means of threats of criminal prosecution which he, the respondent, did knowingly permit and promote to be made with intent to aid Daniel H. Coakley and other persons so to obtain money; whereby the respondent did wilfully and unlawfully abuse the authority of said office and did permit it to be made the instrument of fraud and extortion.

5. In or about September, 1916, the respondent was guilty of malfeasance, misfeasance and nonfeasance in his office in that he did either permit and promote the making of groundless threats of criminal prosecution against divers persons engaged in promoting the Emerson Motors Company, or else, having at hand or available by reasonable effort sufficient evidence for the proper prosecution of criminal charges against such persons, did from improper motives fail to prosecute those charges, whereby he did either wilfully abuse the authority of his office or did wilfully fail to discharge the duties thereof.

6. In or about November, 1916, the respondent conspired with Daniel H. Coakley and other persons to extort from one Warren C. Daniel, a dealer in securities, a large sum of money by threats of criminal prosecution for offences against the laws of this Commonwealth.

7. In or about December, 1916, the respondent did permit and

promote the making of threats of criminal prosecution against Warren C. Daniel and divers other persons, in order to frighten Daniel into paying a large sum of money, to wit: $10,000, to Coakley, whereby the respondent did wilfully and unlawfully abuse the authority of his office and did permit it to be made the instrument of fraud and extortion.

8. In or about November, 1916, the respondent conspired with Daniel H. Coakley and other persons to extort from Warren C. Daniel a large sum of money by threats of criminal prosecution against Daniel and other persons, and pursuant to such conspiracy did permit and promote the making of threats of criminal prosecution against Daniel and divers other persons in order to frighten Daniel into paying a large sum of money, to wit: $10,000, to Coakley, whereby the respondent did wilfully and unlawfully abuse the authority of his office and permit it to be made the instrument of fraud and extortion.

9. In or about November, 1916, the respondent corruptly aided and abetted Daniel H. Coakley and divers other persons in an attempt to obtain from Warren C. Daniel and divers other persons a large sum of money, to wit: $10,000, by means of threats of criminal prosecution, which the respondent did knowingly permit and promote to be made with intent to aid Coakley and other persons in the attempt so to obtain the money whereby he, the respondent, did wilfully and unlawfully abuse the authority of his said office and did permit it to be made the instrument of fraud and extortion.

10. In or about November, 1916, the respondent was guilty of malfeasance, misfeasance and nonfeasance in his office in that he did either permit and promote the making of groundless threats of criminal prosecution against Warren C. Daniel, or else, having at hand or available by reasonable effort evidence sufficient for the proper prosecution of the charges against Daniel, did from improper motives fail to prosecute such charges, whereby he did either wilfully abuse the authority of his office or did wilfully fail to discharge the duties thereof.

11. In or about March, 1918, the respondent did conspire with Daniel H. Coakley to cause one Dorothy Coté, by threats of criminal prosecution, to abandon a suit for the conversion of an automobile.

12. In or about March, 1918, the respondent did permit and promote the making of threats to institute criminal prosecution against Dorothy Coté unless she would abandon her action for the conversion of an automobile, and she, in fear of the criminal prosecution so threatened, did thereupon abandon her action for the conversion of an automobile, and did release the same to one Lawrence, a client of Daniel H. Coakley, whereupon Coakley notified the respondent that he, Coakley, desired the respondent to stop the threatened prosecution against Dorothy Coté, and thereupon the respondent did from improper motives abandon and stop the threatened prosecution, whereby he did abuse the authority of his office and did knowingly permit the same to be. made the instrument of fraud and extortion.

13. In or about March, 1918, the respondent conspired with Daniel H. Coakley to cause Dorothy Coté, by threats of criminal prosecution to abandon a suit for the conversion of an automobile. Pursuant to such conspiracy the respondent did permit and promote the making of threats of criminal prosecution against Dorothy Coté, and she, in fear of the criminal prosecution so threatened, did abandon the suit for the conversion of an automobile, and did release the same to one Lawrence, a client of Coakley, whereupon the respondent did from improper motives and at the request of Coakley abandon the threatened prosecution of Dorothy Coté, whereby the respondent did abuse the authority of his said office, and did knowingly permit the same to be made the instrument of fraud and extortion.

14. In or about March, 1918, the respondent corruptly aided and abetted Daniel H. Coakley and other persons to frighten Dorothy Coté into abandoning a certain suit for the conversion of an automobile by threats of criminal prosecution which the respondent did knowingly permit and promote to be made with intent to aid Coakley, whereby the respondent did unlawfully and wilfully abuse the authority of his office and permit it to be made the instrument of extortion and fraud.

15. In or about March, 1918, the respondent was guilty of malfeasance, misfeasance and nonfeasance in his office in that he did permit and promote the making of groundless threats of criminal prosecution against Dorothy Coté, or else, having at hand or available by reasonable effort evidence sufficient for the proper

prosecution of the charges against her, did from improper motives fail to prosecute such charges, whereby he did either wilfully abuse the authority of his office or did wilfully fail to discharge the duties thereof.*

21. In or about October, 1915, the respondent conspired with Daniel H. Coakley and William J. Corcoran, at that time District Attorney for the Northern District, and other persons, to extort from one Curtis Wilson Emery and Elizabeth Emery, wife of Curtis Wilson Emery, and Jennie S. Chase, mother of Elizabeth Emery, and other persons, a large sum of money by threats of criminal prosecution.

22. In or about October, 1915, the respondent did permit and promote the making of threats of criminal prosecution with intent to aid Daniel H. Coakley in an attempt to extort a large sum of money from Curtis Wilson Emery, from Elizabeth Emery, wife of Curtis Wilson Emery, and Jennie S. Chase, mother of Elizabeth Emery, whereby the respondent did wilfully and unlawfully abuse the authority of his office and did permit it to be made the instrument of fraud and extortion.

23. In or about October, 1915, the respondent conspired with Daniel H. Coakley, William J. Corcoran, at that time District Attorney for the Northern District, and other persons to extort from Curtis Wilson Emery, Elizabeth Emery, wife of Curtis Wilson Emery, Jennie S. Chase, mother of Elizabeth Emery, and other persons, by means of threats of criminal prosecution. Pursuant to such conspiracy the respondent did permit and promote the making of threats of criminal prosecution in order to frighten the Emerys and Mrs. Chase into paying a large sum of money to procure the discontinuance of the threatened prosecution, whereby the respondent did wilfully and unlawfully abuse the authority of his office, and did permit it to be made the instrument of fraud and extortion.

24. In or about October, 1915, the respondent did corruptly aid and abet Daniel H. Coakley, William J. Corcoran, at that time District Attorney for the Northern District, and other persons,

---

* Specifications contained in paragraphs 16 to 20, inclusive, of the information were not relied on at the hearing on the merits and therefore are omitted here.

in an attempt to obtain a large sum of money from Curtis Wilson Emery, Elizabeth Emery and Jennie S. Chase by threats of criminal prosecution, which the respondent did knowingly permit and promote to be made with intent to aid Daniel H. Coakley, William J. Corcoran, and other persons in the attempt so to obtain the money as aforesaid, whereby the respondent did wilfully and unlawfully abuse the authority of his office and did permit it to be made the instrument of fraud and extortion.

25. In or about October, 1915, the respondent was guilty of malfeasance, misfeasance and nonfeasance in his office in that he either did permit and promote the making of groundless threats of criminal prosecution, and further did institute certain groundless criminal proceedings with intent to aid Daniel H. Coakley, William J. Corcoran, and other persons in an attempt to obtain a large sum of money from Curtis Wilson Emery, Elizabeth Emery, and Jennie S. Chase, or else, having at hand or available by reasonable effort evidence sufficient for the proper prosecution of criminal proceedings, did from improper motives fail to prosecute such proceedings, whereby he did either wilfully abuse the authority of his office or did wilfully fail to discharge the duties thereof.

26. The respondent did from improper motives wilfully fail to prosecute one Merrill W. Shute, who had embezzled the sum of about $15,000 from an aged woman, Emma F. Brackett, of Bangor, Maine. Shute had confessed to the crime in the presence of reliable witnesses. The respondent had caused him to be indicted for embezzlement and afterwards from improper motives entered a *nolle prosequi* as to the indictment.

27. The respondent knowingly made false statements to one H. H. Patten and one William H. Powell, counsel for Emma F. Brackett, concerning the matter described in the preceding paragraph and caused certain entries on the criminal docket relating thereto to be altered.

28. The respondent did from time to time knowingly permit divers persons to use the authority of his office for the purpose of coercing divers other persons to release or settle civil claims or to give up money or property or both, whereby the respondent did knowingly abuse the authority of his office and did knowingly permit the same to be abused. In further specification as to the offences charged in this paragraph, the informant named the

following cases, and afterwards offered evidence relating thereto: Emerson Motors Company case, more fully described in paragraphs 1 to 5, inclusive; Warren C. Daniel case, more fully described in paragraphs 6 to 10, inclusive; Dorothy Coté case, more fully described in paragraphs 11 to 15, inclusive; cases of Curtis Wilson Emery, Elizabeth Emery, and Jennie S. Chase, more fully described in paragraphs 21 to 25, inclusive; Frank Peters; Myer Berman; Walter A. Buckley; Benjamin Piscopo; Edward C. Tripp, on or about July, 1915; Charlotte Broad, on or about October, 1916.

29. In divers cases the respondent knowingly aided and abetted divers persons in extorting or attempting to extort money or property from divers other persons by threats of criminal prosecution. In further specification as to the offences charged in this paragraph the informant named the following cases as to which he afterwards offered evidence: Emerson Motors Company case, more fully described in paragraphs 1 to 5, inclusive; Warren C. Daniel case, more fully described in paragraphs 6 to 10, inclusive; Dorothy Coté case, more fully described in paragraphs 11 to 15, inclusive; cases of Curtis Wilson Emery, Elizabeth Emery and Jennie S. Chase, more fully described in paragraphs 21 to 25, inclusive; Frank Peters, indicted for assault with intent to rape, date of alleged commission of offence on or about June, 1916; Myer Berman, on or about November, 1916; Walter A. Buckley, on or about January and February, 1917; Benjamin Piscopo, 1917 or 1918; Edward C. Tripp, on or about July, 1915; Charlotte Broad, on or about October, 1916.

30. In divers cases the respondent, having sufficient evidence in his possession or available by reasonable effort, from improper motives failed to prosecute or cause to be prosecuted by his assistants persons who had committed crime within his jurisdiction. In further specification of the offences charged in this paragraph the informant named the following cases, as to which he afterwards offered evidence: Israel Mancovitz, with several aliases, charged with burglary, breaking and entering, receiving stolen goods, possession of burglar's tools, and larceny, fourteen offences, alleged to have been committed on or about December, 1919, to March, 1920; Alfred Soracco, charged with maintaining a liquor nuisance, on or about February, 1921; Merrill W. Shute, charged

with larceny, the crime being more fully described in paragraph 26; Israel M. Szathmary and Alice M. Gederman, charged with adultery, alleged to have been committed on or about February, 1920; John Prendergast, charged with accosting, on or about April 17, 1916; George T. Perry et al., crime of larceny, on or about December, 1918.

31. The respondent in violation of his oath of office from improper motives entered a *nolle prosequi,* or permitted assistant district attorneys to do so, as to cases which should have been prosecuted. In further specification of the offences charged in this paragraph, the informant set forth the following instances: Isaac Gordon, charged with keeping a house of ill fame on or about September and October, 1919; Thomas Nee, with several aliases, charged with an attempt to break and enter in the nighttime on or about December 31, 1920; Mary Fuller, alias "Brownie" Kennedy, alias Lillian Dale, charged with keeping a house of ill fame, and of fornication on or about November, 1916; Arthur L. Stone, charged with adultery on or about March 6, 1920.

32. The respondent with witnesses at hand or available so that by reasonable effort he could have obtained information required for the proper prosecution of cases, wilfully closed his eyes to his duty and withheld proper evidence and neglected to introduce proper evidence, or knowingly permitted assistant district attorneys so to do, thereby wilfully failing to discharge the duties of his said office. In further specification as to the offences charged in this paragraph, the informant named the following cases, as to which he introduced evidence: Israel Mancovitz, with many aliases, fourteen cases, including charges of burglary, breaking and entering, receiving stolen goods, possession of burglar's tools, larceny, committed on or about December, 1919, to March, 1920; Alfred Soracco, charged with maintaining a liquor nuisance on or about February, 1921; Merrill W. Shute, charged with the crime of larceny, as more fully described in paragraph 26; Israel M. Szathmary and Alice M. Gederman, charged with adultery on or about February, 1920.

33. The respondent from improper motives himself or by his assistants procured indictments which ought not to have been procured. In further specification as to the offences charged in this paragraph, the informant named the following cases, as to

which he introduced evidence: Ralph H. Robb, Curtis W. Emery and Andrew Le Clair, charged with conspiracy to accuse of crime on or about January, 1916; Frank Peters, charged with assault with intent to rape on or about June, 1916.

34. The respondent knowingly permitted his assistants to abuse the authority of his office, and nevertheless retained them in office with knowledge of their misconduct. In further specification of instances of dereliction from duty in the particulars described in this paragraph, the informant named the following cases, as to which he introduced evidence: Israel Mancovitz, with many aliases, charged with fourteen offences of burglary, breaking and entering, receiving stolen goods, possession of burglar's tools, and larceny on or about December, 1919, to March, 1920; Thomas Nee, with many aliases, charged with an attempt to break and enter in the night time on or about December 31, 1920; Alfred Soracco, charged with maintaining a liquor nuisance on or about February, 1921.

35. The respondent knowingly permitted his assistants to fail to discharge the duties of his office and nevertheless retained them in office with knowledge of their neglect of duty. In further specification of instances of derelictions from duty of the nature described in this paragraph, the informant named the following cases, as to which he introduced evidence: Israel Mancovitz, with many aliases, charged with fourteen offences of burglary, breaking and entering, receiving stolen goods, possession of burglar's tools, and larceny on or about December, 1919, to March, 1920; Thomas Nee, with many aliases, charged with an attempt to break and enter in the night time on or about December 31, 1920; Alfred Soracco, charged with maintaining a liquor nuisance on or about February, 1921.

On November 17, 1921, the respondent moved that hearings in the cause be postponed to January 22, 1922, and the Attorney General moved for a speedy completion of the pleadings and a hearing. The motions were heard by *Rugg,* C. J., *Braley, Crosby, Carroll, & Jenney,* JJ., and on the next day it was ordered that the respondent file on or before November 23, 1921, whatever motion for specifications as to matters charged in the information, or other special pleading to the information he might desire to file; and that the Attorney General file on or before November 26,

1921, such further specifications or other pleading in view of motion for specifications or other special pleading so to be filed by the respondent.

On November 18, 1921, by reason of a statement made to the court by the Attorney General on the preceding day and the attendant circumstances, the court made the following order:

"Whereas the Attorney General called to the attention of the court on November 17, that the respondent made a statement in a public speech to the effect, in substance, 'If anybody tells you Pelletier's going to withdraw, tell him he's wrong. If he persists, tell him he's a liar. If he is n't convinced, back it up with your fists and I 'll nol pros the case,' the Attorney General saying that the fact of the making such statement by the respondent was supported by affidavit; and whereas the respondent made no reply on November 17 to the statement thus made in his presence to the court by the Attorney General; and whereas the respondent in open court on the present date, being given liberty to make any statement which he desired concerning that particular matter, said he did not desire then to make any reply or statement concerning the same; it is ordered that the Attorney General, having orally called this matter to the attention of the court, bring it as matter of record before the court either by amendment to the present information, by a new information or in such other appropriate manner as he may determine."

In accordance with the foregoing order, the Attorney General on November 21, 1921, filed an

ADDITIONAL INFORMATION, verified by his own oath, specifying as additional acts of the respondent rendering him unfit for his office, the following:

"1. That at a public meeting held in Boston on the evening of November 15, 1921, said Pelletier publicly addressed divers persons gathered at said meeting, and while he was addressing said persons as aforesaid said, 'There is a dirty low down propaganda going throughout the city I am going to resign. Tell the man who tells you that he is wrong. If he persists tell him he is a liar. Back it up and I will nol pros case.' And that at the conclusion of said address said Pelletier further made the following statement, 'I am not making any cheap political speech. I am giving you facts.'

"2. That at another public meeting, held on November 9, 1921, in the Municipal Building, South Boston, said Pelletier publicly addressed divers persons gathered at said meeting, and while he was addressing said persons as aforesaid said, in substance, 'If any one tells you I am going to withdraw from this contest call him a liar, back it up and I'll nol pros your case.'"

On November 23, 1921, the respondent filed an answer to the additional information admitting that he was District Attorney for the Suffolk District and that he held that office by election thereto and qualification therein, and denied that he had been guilty of malfeasance, misfeasance, and nonfeasance in his office, that he had conducted himself in his office in an unlawful and reprehensible manner, and that he was an unfit person to hold that office; and denied "each and every allegation and particular set forth in each and every paragraph of the specifications annexed to the said additional information."

On December 12, 1921, the respondent filed an answer to the first information in substance as follows:

"1. Now comes Joseph C. Pelletier, appearing specially and without waiving any rights asserted in any other pleading in this case or in any other case and without acknowledging the jurisdiction of the . . . court or any of the justices thereof to hear the matters contained in the information filed herein and for answer says:

"2. That neither the Supreme Judicial Court nor a majority of the justices thereof nor any of them has any jurisdiction to hear and determine the question of his fitness to hold the office of District Attorney for the Suffolk District of said Commonwealth or to decide the question as to whether the public good requires his removal from said office because the law under which the information is brought and under which the power of the court to determine the question of the removal of said Pelletier from the said office is invoked is unconstitutional and void as against the ninth article of the Bill of Rights of the Inhabitants of the Commonwealth in that it tends to interfere with the freedom of elections and the right of the inhabitants of the Commonwealth to elect officers and to be elected for public employments and as against the eighth article of the second section and the sixth article of the third section of the first chapter of the Frame of Government of

the People of the Commonwealth in that said statute purports to provide a method for the removal of officers of the Commonwealth different from that provided by the Frame of Government in the before-named sections, to wit: impeachment by the House of Representatives and hearing and determination by the Senate.

"3. The said statute is unconstitutional and void as against the thirtieth article of the Bill of Rights in that it purports to give the judicial department the right to exercise legislative powers which are specifically reserved to the legislature by the Constitution.

"4. The said statute is unconstitutional and void as against the twelfth article of the Bill of Rights in that it purports to give the justices of the Supreme Judicial Court or a majority of them the power to deprive persons of their property, immunities, privileges, and estate otherwise than by the judgment of their peers or the law of the land.

"5. The said statute is unconstitutional and void as against the fourteenth article of the Articles in Amendment of the Constitution of the United States of America in that it purports to give the justices of the Supreme Judicial Court or a majority of them the power to deprive persons of their property without due process of law and denies to persons within the jurisdiction of the Commonwealth the equal protection of the laws.

"6. And further answering the said Joseph C. Pelletier admits that he is District Attorney for the Suffolk District and that he holds said office by election thereto and qualification therein, and denies that he has been guilty of malfeasance, misfeasance, or nonfeasance in his said office and denies that he has conducted himself in said office in an unlawful and reprehensible manner and denies that he is an unfit person to hold said office and denies that the public good requires his removal, and on the contrary says that he has conducted himself in said office in a proper and creditable manner and that his conduct in said office has been ratified by the people of the said Suffolk District in four successive elections subsequent to the election of 1909, and that prior to the last election of said Pelletier to said office, all or substantially all the charges in said information were offered to the electorate and declared to be true by a candidate for said office opposing said Pelletier, who thereupon joined issue and stood upon his record

in said office, and notwithstanding said publication and upon the joinder of issue thereon the said Pelletier was elected and his conduct ratified by the largest majority ever accorded a candidate for the said office, and that the judgment of the qualified electors of the said Suffolk District so expressed in five legal elections is final and conclusive on the question of the said Pelletier's fitness to hold said office and the requirements of the public good respecting his holding of said office.

"7. And further answering the said Pelletier denies each and every allegation and particular set forth in each and every paragraph of the specifications annexed to the information in this case and the specifications filed by the informant on November 28, 1921, and says that in each of the several cases set forth in the specifications of the information and of the further specifications the said Pelletier acted in accordance with his best judgment upon the evidence then presented to him and in the exercise of his sound discretion and under the power which attaches by law to his said office of District Attorney to which said office and to the powers appertaining thereto he was duly entitled by virtue of an election as aforesaid on each of the occasions mentioned in the information and the specifications filed herein and that on each of the said occasions and in each of the said cases he acted in the performance of his legal duty as District Attorney for the Suffolk District.

"8. And further answering as to those allegations in the information and the specifications which relate to the conduct of his assistants, the said Pelletier denies that in any of the cases mentioned in the information and specifications or in any other cases his assistants were guilty of any misconduct, abuse of the authority of his office, or failure in the discharge of the duties of the said office, and says that in each of the several instances set forth in the information and the specifications the assistant whose conduct is the subject of allegations, acted in accordance with his best judgment upon the evidence then presented to him and in the exercise of his sound discretion and under the power which attaches to his said office as Assistant District Attorney by law and by the authority and confidence given him by the said Pelletier.

"9. And further answering as to those allegations in the in-

formation and the specifications which relate to the conduct of his assistants, the said Pelletier, while acknowledging his general and legal responsibility for the acts and conduct of his assistants, says that in each of the several instances set forth in the information and the specifications the assistant whose conduct is the subject of allegations acted by virtue of the general authority conferred on him by law and by the said Pelletier and without the personal and immediate direction of the said Pelletier and without the attention of the said Pelletier having been called to the conduct of the assistant in each case and having no immediate or specific knowledge in regard to the act of his assistant in each of these cases the said Pelletier is not guilty of malfeasance, nonfeasance, or misfeasance with regard thereto."

In paragraphs 10–22, inclusive, of the answer, the respondent alleged, specifically as to each specification in the information of improper conduct of the respondent in his office, that "all the conduct of the said Pelletier with reference thereto occurred and took place prior to the ninth day of November, 1919, when the said Pelletier was duly elected to his said office, by virtue of which said election he has ever since retained the said office and now holds it and that therefore the Supreme Judicial Court or the justices thereof or a majority of them have no jurisdiction, right, or authority to hear anything or conduct any proceedings relating to the matters alleged in these paragraphs because of the fact that since the date of the alleged transactions he has been elected to said office and his conduct therein ratified by the people of the Suffolk District."

"23. And as to the cases of Myer Berman, Walter A. Buckley, and Benjamin Piscopo named in paragraphs 1 and 2 of the specifications filed on November 28, 1921, the said Pelletier is unable to answer at this time because the informant has not furnished him with sufficient particulars upon which he can make answer to these cases" and the respondent asked "that the information be dismissed as to these cases" for lack of sufficient specifications.

"24. And further answering the said Pelletier questions the qualifications of the said Court or the justices thereof or any of them to sit in judgment upon this case and says that if the said Court or the justices thereof or any of them sit in judgment upon this case and upon the question of his holding the said office his,

the said Pelletier's, rights under the Fourteenth Article of the Articles in Amendment of the Constitution of the United States relative to due process of law will be violated, and upon this he pleads to the jurisdiction of the Court and objects to the hearing of this case by said Court or any of the justices thereof.

"25. And further answering the said Pelletier says that there is no basis in fact for the allegations set forth in the said information or the specifications thereto, but that the accusations contained therein are the result of and are made in pursuance of a conspiracy by divers persons to injure, defame, and ruin the said Pelletier as will be shown and proven by the said Pelletier hereafter as required.

"26. And for the reasons herein set forth the, said Pelletier moves that the information be dismissed."

The informations were assigned for hearing on December 19, 1921. On that day, before *Rugg*, C. J., *Braley, De Courcy, Carroll, & Jenney*, JJ., the respondent presented the following document, entitled "Motion to Dismiss and Plea to the Jurisdiction":

"Now comes Joseph C. Pelletier appearing specially for this purpose and moves that the information be dismissed and says that the Supreme Judicial Court or a majority of the justices thereof or any of the justices thereof ought not to take cognizance of the matters in the information and additional information filed therein and that he ought not to be held to answer to the same because neither the Supreme Judicial Court nor a majority of the justices thereof nor any of the justices thereof have jurisdiction to hear and try the matters alleged in the said informations and in support of the said motion and plea alleges the following:

"1. That he was duly elected District Attorney·for the Suffolk District of said Commonwealth on the fourth day of November, 1919, and duly qualified by taking the oaths required by law on the eighth day of January, 1920.

"2. The election of said Pelletier to said office was under and by virtue of the provisions of the nineteenth article of the articles in amendment to the Constitution of Massachusetts, which reads as follows: 'Art. XIX. The legislature shall prescribe, by general law, for the election of sheriffs, registers of probate, [commissioners of insolvency,] and clerks of the courts, by the people of the several

counties, and that district-attorneys shall be chosen by the people of the several districts, for such term of office as the legislature shall prescribe.'

"3. Nowhere in said information is it alleged that said Pelletier has not been duly elected to said office or that he has not been duly qualified thereto, but on the contrary his due election and qualification are admitted by the informant.

"4. Said Pelletier is an officer of the Commonwealth as described in the eighth article of the second section and the sixth article of the third section of the first chapter of the second part of the Constitution of said Commonwealth entitled 'The Frame of Government;' which sections provide for the impeachment of officers of the Commonwealth.

"5. It is proposed to pass upon alleged acts and conduct of said Pelletier, occurring prior to his election and qualification for said office, as a cause for his removal from said office, said alleged acts and conduct not being such as to disqualify said Pelletier from being elected to, qualifying as and holding the office of district attorney for said district. The removal of said Pelletier for such alleged acts and conduct is adding to the qualifications required by the Constitution and laws of the Commonwealth for the office of said district attorney and is a review of the action of the electorate in violation of the ninth article of the Bill of Rights of the Constitution which is as follows: 'IX. All elections ought to be free; and all the inhabitants of this commonwealth, having such qualifications as they shall establish by their frame of government, have an equal right to elect officers, and to be elected, for public employments.'

"The only qualification prescribed for a person to be elected to the office of district attorney is the qualification prescribed for those entitled to vote for senators and representatives to the General Court.

"It is not only a denial of the equal right of all the inhabitants possessing the qualification required by the frame of government to be elected to public employment but is also a denial of the equal right of those having the qualifications to elect to the office of district attorney, from among those having the required qualifications, the person of their choice, for any individual or set of individuals or any court to require additional qualifications for

the office of district attorney to those prescribed by law at the time of said Pelletier's election.

"And for the reasons set forth in the foregoing paragraph numbered 5, the said Pelletier moves that the information be dismissed as to such parts thereof as relate to acts or omissions alleged to have taken place prior to the last election of the said Pelletier to the said office of district attorney, which said election took place on the fourth day of November, 1919.

"6. The Constitution of this Commonwealth provides for the impeachment of officers of the Commonwealth by the House of Representatives and the hearing and determination of such impeachments by the Senate as a Court and the removal from office by the Senate of officers so impeached, and no other way of removing officers of the Commonwealth from their offices during the term for which they have been elected is provided by the Constitution of the Commonwealth and the provision that impeachments shall be brought by the House of Representatives and heard and determined by the Senate and officers of the Commonwealth removed by the Senate is the law of the land.

"7. The said information and all proceedings which have been taken thereupon or may be taken thereupon are and will be unconstitutional and void because the statute under which the information purports to be brought, to wit: section 4 of chapter 211 of the General Laws is unconstitutional and void as is set forth in the following paragraphs.

"8. Section 4 of Chapter 211 of the General Laws is unconstitutional and void so far as it relates to the removal of a District Attorney if the justices of the Supreme Judicial Court or a majority of them purport to act as a court, because any action taken under it to that end would be an exercise by the Judicial department of the Legislature or Executive powers, which is forbidden by the thirtieth article of the Bill of Rights of the Inhabitants of the Commonwealth.

"9. Section 4 of Chapter 211 of the General Laws is unconstitutional and void so far as it relates to the removal of a District Attorney because it purports to give the justices of the Supreme Judicial Court or a majority of them the power to deprive said Pelletier of his property, immunities, privileges and estate otherwise than by the judgment of his peers or the law of the land, all

of which is contrary to the twelfth article of the Bill of Rights of the Inhabitants of the Commonwealth.

"10. Section 4 of Chapter 211 of the General Laws is unconstitutional and void so far as it relates to the removal of a District Attorney because it abridges the privileges and immunities of citizens of the United States of America and purports to give the justices of the Supreme Judicial Court or a majority of them the power to deprive persons of property without due process of law, and denies to persons within the jurisdiction of the Commonwealth the equal protection of the laws, all of which is forbidden by the first section of the fourteenth article of the Articles in amendment of the Constitution of the United States of America.

"11. The due process of law for the removal of said Pelletier for misconduct and mal-administration in his office is impeachment by the House of Representatives and hearing and determination by the Senate, as provided by the Constitution of said Commonwealth; this is a legislative power of which the legislature cannot divest itself, and cannot delegate to the justices of the Supreme Judicial Court or a majority of them either as a court or as individuals, or to any other person or body.

"12. As an officer of the Commonwealth said Pelletier is entitled to the equal protection of the laws as to his right to hold his said office, and cannot be deprived of said right by any apparent process of law which is not equally applicable to all other officers of the Commonwealth described in the Constitution of said Commonwealth and can only be removed from said office during the term for which he is elected by the process of law provided by the constitution for such removal of all officers of the Commonwealth and this protection is guaranteed said Pelletier by the fourteenth article of the Articles of Amendment to the Constitution of the United States of America.

"13. Section 4, of Chapter 211 of the General Laws is unconstitutional and void so far as it relates to the removal of a District Attorney because it purports to give the justices of the Supreme Judicial Court or a majority of them the power to deprive said Pelletier of his equal right to be elected to public employ as guaranteed by the ninth article of the Bill of Rights of the Inhabitants of the Commonwealth.

"14. Section 4 of Chapter 211 of the General Laws is uncon-

stitutional and void so far as it relates to the removal of a District Attorney because it purports to give the justices of the Supreme Judicial Court or a majority of them the power to deprive the inhabitants of the Suffolk District of the right to elect officers, which right is guaranteed by the ninth article of the Bill of Rights of the Inhabitants of the Commonwealth.

"15. The exercise by the justices of the Supreme Judicial Court or a majority of them of any power purported to be given by the said statute would be the exercise of a power not granted to the said justices or a majority of them by the people in their constitution but on the contrary specifically reserved by the people to the legislature, and the said justices or a majority of them can have no jurisdiction to exercise such a power or to take proceedings tending towards the exercise of such a power.

"16. Section 4 of Chapter 211 of the General Laws is unconstitutional and void because it violates Article 2 of Chapter 6 of the Frame of Government of the Constitution of the Commonwealth which in the first paragraph thereof reads as follows: 'No governor, lieutenant-governor, or judge of the supreme judicial court, shall hold any other office or place, under the authority of this commonwealth, except such as by this constitution they are admitted to hold, saving that the judges of the said court may hold the offices of justices of the peace through the state; nor shall they hold any other place or office, or receive any pension or salary from any other state or government or power whatever'; and because the tribunal purported to be set up by the said statute is a special and limited tribunal and the justices of the Supreme Judicial Court cannot constitutionally be appointed thereto.

"17. Section 4 of Chapter 211 of the General Laws is unconstitutional and void because it violates the tenth article of the Bill of Rights of the Inhabitants of the Commonwealth which provides that each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property according to the standing laws, and this statute purports to provide for the removal of said Pelletier from his office of district attorney in a manner contrary to the standing laws of the Commonwealth, to wit: the Supreme law of the Constitution which provides that officers of the Commonwealth shall be removed only by impeachment and trial by the General Court.

"18. The said Joseph C. Pelletier was duly elected to the office of District Attorney for the Suffolk District on the fourth day of November, 1919, and duly qualified thereto on the eighth day of January, 1920; his term of office under the laws of the Commonwealth of Massachusetts is for three years ending the first Wednesday in January, 1923; he is entitled to hold the said office until that date and to receive a salary of nine thousand dollars for each year of the said term payable out of the treasury of the Commonwealth on the first day of each month therein in proportionate amounts; he has a right of property in the said office and the emoluments thereof, and he has a right to the equal protection of the laws of the said Commonwealth as to his holding of said office and receiving the emoluments thereof, which said rights are guaranteed him by the fourteenth article of the Articles in amendment of the Constitution of the United States of America; on the twenty-sixth day of October, 1921, and on the nineteenth day of November, 1921, J. Weston Allen, Attorney General for the Commonwealth of Massachusetts, filed a proceeding purporting to be an information before the justices of the Supreme Judicial Court of the said Commonwealth alleging that the public good requires the removal of the said Pelletier from his said office, and praying for his removal from the said office, and the justices of the Supreme Judicial Court aforesaid have ordered the defendant to appear and show cause why this prayer of the said information should not be granted and to answer the charges contained therein, and subsequent thereto they have ordered the said Pelletier to appear and defend the said charges against him on the nineteenth day of December, 1921, which date has been assigned by the said justices for the hearing of the evidence in support of the said information; the said Joseph C. Pelletier is an officer of the Commonwealth of Massachusetts under the Constitution and the laws thereof, and under the Constitution and laws of the said Commonwealth he has been duly elected to said office and can be removed prior to the expiration of the term for which he is elected only upon impeachment by the House of Representatives and trial and determination of the said impeachment by the Senate as is provided in chapter 1, section 2, article 8, and section 3, article 6, of the Frame of Government of the said Commonwealth, and the provisions of said articles of

the Constitution of Massachusetts are the law of the land relating to the removal of said Pelletier from the said office prior to the expiration of the term for which he was elected; the said justices of the Supreme Judicial Court propose and are about to hear evidence as to the qualifications and fitness of the said Pelletier, and the requirements of the public good as to his holding said office, and the said justices propose, if in their opinion sufficient cause is shown and the public good requires, to remove the said Pelletier from his said office and deprive him of the emoluments thereof before the expiration of the term for which he has been elected and thereby to terminate in a manner not provided by and contrary to the Constitution of the said Commonwealth the contract which exists between the said Pelletier and the people of the said Commonwealth and of the said Suffolk District relative to his services in the office of the said district attorney and to impair the obligation thereof, and the proceedings which have been and are about to be taken upon the said information are a violation of the rights of the said Pelletier which are guaranteed him by article 1, section 10 of the Constitution of the United States of America and article 14 of the Articles in amendment of the Constitution of the United States of America."

At the same time when the "Motion to Dismiss and Plea to the Jurisdiction" was presented, the respondent asked for a postponement of the hearing. Upon the motion for postponement, the court on the same day orally made the following order: "The time for hearing has been fixed with a view to full and fair opportunity to the respondent, but also in view of the exigency which confronts the court in the performance of its judicial work. That exigency is very great. To that exigency everything except the administration of complete justice must yield. A request is made this morning by counsel for defendant by reason of important public duties resting on him as a senator of the United States, which duties have become more acute in point of time since the last hearing, that the hearing on the merits be postponed until next week, with the express understanding that no further postponements will be asked. He has also suggested that he is willing to argue certain questions of law this morning. We feel obliged to require arguments on questions of jurisdiction of the court, of constitutional questions, and of matters of a preliminary nature,

to be made today. Of course the consideration of the questions thus raised will require the careful attention of the court. Unless the decision upon these matters be in favor of the respondent, the court will then suspend further hearings until Tuesday, December 27, at half-past nine in the forenoon, when the hearing of evidence will begin and continue without interruption."

Preliminary matters described in the order of the court above described accordingly then were heard on December 19, 20, 1921.

*J. A. Reed* of Missouri, (*D. M. Lyons* with him,) for the respondent.

*J. W. Allen,* Attorney General, (*James J. McCarthy, R. G. Dodge & A. Marshall,* Special Assistant Attorneys General, *E. H. Abbot, Jr. & A. Lincoln,* Assistant Attorneys General, with him,) for the informant.

On December 22, 1921, the following order was made:

"The paper offered on December 19, 1921, by the respondent, entitled 'Motion to Dismiss and Plea to the Jurisdiction,' may be filed. Similar and kindred matters are set up in the answer heretofore filed by the respondent as bar in law to the information. For convenience the several paragraphs of that answer are treated as numbered from 1 to 26, both inclusive, in accordance with the paragraphing shown in the printed record.

"After hearing and consideration, the 'Motion to Dismiss and Plea to the Jurisdiction' are denied and overruled, and the paragraphs numbered two to five, both inclusive, ten to twenty-two, both inclusive, and twenty-four, of the answer, and so much of paragraphs numbered six and seven thereof as relate to the effect of the re-election or re-elections of the respondent, are adjudged insufficient in law and are overruled."

On January 3, 1922, the following opinion relating to the matters of law involved in the foregoing order was filed:

RUGG, C. J. This is an information brought by the Attorney General for the removal of the respondent from the office of District Attorney for the Suffolk District. It conforms to the terms of G. L. c. 211, § 4. The statutory words, so far as here material, are, — "A majority of the justices [of the Supreme Judicial Court] . . . if sufficient cause is shown therefor and it appears that the public good so requires, may, upon a bill, petition or other process, upon a summary hearing or otherwise, remove

. . . a county commissioner, sheriff, register of probate and insolvency or district attorney." The respondent assails the constitutionality of the statute.

A district attorney does not come within the classification of officers removable only by impeachment. It is provided by c. 1 of the Constitution in § 3, art. 6 and § 2, art. 8, that "any officer or officers of the commonwealth" may be removed by impeachment. This provision of the Constitution was not intended to include all civil officers of every grade. There are several classes of such officers, elected by or appointed for municipalities, counties, districts and the State. Among these are many officials performing strictly public functions, such as police officers, assessors, school officials, county commissioners, officers of the various metropolitan districts and others, many of which are enumerated in *Bolster* v. *Lawrence,* 225 Mass. 387. It cannot be seriously contended that all of these are removable by impeachment. Plainly the district attorney in this sense is a public officer performing important duties in behalf of the Commonwealth. That, however, is not the test of impeachability.

"Officers elected by the people at large, or provided for in the Constitution for the administration of matters of general or State concern, are subject to impeachment." *Opinion of the Justices,* 167 Mass. 599, 600. The district attorney does not fall within this description. He is elected by the voters of the several districts into which the State is divided, not by "the people at large." The office of district attorney is not created nor provided for in the Constitution. It is mentioned only in articles 8 and 19 of the amendments. Those articles recognize that office as existing, but do not secure its tenure nor establish any right in the office superior to the control of the Legislature. The office may be regulated, limited, enlarged or abolished by the Legislature, according to its view of the public interests. The only factor concerning the office secured by the Constitution is that the incumbent shall be elected by the people of the district as established by the General Court. In every other respect it is subject to the legislative power. *Opinion of the Justices,* 117 Mass. 603. *Dearborn* v. *Ames,* 8 Gray, 1. *Opinion of the Justices,* 216 Mass. 605.

There is nothing in the statute which violates in any degree the provisions of art. 9 of the Declaration of Rights as to freedom of

elections and the right to be elected for public employment. Neither that article nor any other provision of the Constitution assures to an officer, whose continuance in office has been judicially determined in accordance with a general statute to be contrary to the public welfare, the right still to remain in office.

The statute here under consideration violates no provision of art. 10 of the Declaration of Rights. It there is guaranteed that "Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty, and property, according to standing laws." The statute is itself a "standing law." The statute affects neither the life, liberty nor property of the respondent. No right of his is impaired when the General Court provides for his removal by a general law.

It is provided by art. 12 of the Declaration of Rights that "No subject shall be . . . deprived of his property, immunities, or privileges, . . . or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land." The office of district attorney is not "property" nor "estate" within the meaning of those words in this article. It is purely a public trust to be administered solely for the interest of all the people. *Ashley* v. *Three Justices of the Superior Court,* 228 Mass. 63, 73. Plainly it is not an "immunity" nor a "liberty" of the holder of the office. If it be regarded as his "privilege," which need not be decided, ample provision is made by G. L. c. 211, § 4, according to "the law of the land" for removing a district attorney from office. This court has never attempted to give a definition of these words of the Constitution. Beyond all doubt there is compliance with "the law of the land" when there is judicial process, adequate notice, a statement of the charges, a fair hearing even though it may be summary under appropriate circumstances, and final judgment for a sufficient cause founded upon considerations springing solely from the requirements of the public good, all as ascertained and determined in accordance with procedure of established courts. All this implies the restraints imposed by the recognized principles of private rights and distributive justice and absence of arbitrary action. *Twining* v. *New Jersey,* 211 U. S. 78, 100, 101. The statute here attacked by express terms or necessary implication affords all these elements of protection to the officer against whom the proceeding is brought.

The statute here assailed is not violative of art. 30 of the Declaration of Rights, which sharply separates the executive, legislative and judicial departments of government and prohibits each from undertaking the performance of other than its own appropriate functions. The Legislature has no right to impose upon the Justices of the Supreme Judicial Court any other than strictly judicial duties. The Justices have no right to assume the discharge of any other than judicial duties. They have no authority and cannot be clothed by the General Court with power to act as a committee of inquiry, as a special or limited tribunal or commission, or to perform any executive or legislative business, or to be anything except a court. As incidental to the judicial power and the jurisdiction conferred upon the Justices of this court by the Constitution and laws, a considerable number of subsidiary duties may be exercised by them under the authority of statutes. But they cannot go outside those which pertain to the judicial faculty. *Case of Supervisors of Elections,* 114 Mass. 247. *Boston* v. *Chelsea,* 212 Mass. 127. *Driscoll* v. *Mayor of Somerville,* 213 Mass. 493. *Swan* v. *Justices of the Superior Court,* 222 Mass. 542. *Dinan* v. *Swig,* 223 Mass. 516. The statute here attacked confers the power and imposes the duty of hearing this information upon the Justices of the Supreme Judicial Court sitting as a court. The subject matter is proper for judicial inquiry. It conforms to art. 30 of the Declaration of Rights.

It follows from what has been said that in G. L. c. 211, § 4, there is no violation of that part of c. 6, art. 2 of the Constitution which prohibits "any judge of the supreme judicial court" from holding "any other office or place," with an exception not here material. The statute imposes the duty upon the Justices as a court. It does not purport to create a special or limited tribunal to be composed of the Justices.

The election of the respondent as district attorney and his acceptance of the office constituted no contract between the respondent and the Suffolk district under the laws and Constitution of this Commonwealth. The relation thereby established was not contractual but arose out of the statute providing for the election. *Walker* v. *Cook,* 129 Mass. 577. *Cook* v. *Springfield,* 184 Mass. 247. Moreover, the statute here under consideration was in force long before the election of the respondent, and, being a valid

exercise of legislative power, entered into the fibre and formed a part of the office which he accepted. The office of district attorney in every respect except the manner of his election is under the control of the General Court. This includes method of removal. *Opinions of the Justices,* 117 Mass. 603; 216 Mass. 605. It would have been within the power of the Legislature to enact a statute like that here attacked and make it applicable to one holding such a public office at the time of its enactment. *Graham* v. *Roberts,* 200 Mass. 152, 157, and cases there collected. *Butler* v. *Pennsylvania,* 10 How. 402, 415-417.

It is urged by the respondent that G. L. c. 211, § 4, is violative of his rights under the Fourteenth Amendment to the Constitution of the United States. There seems to us to be no substantial ground for this contention. The statute was in existence long before his election to office. It was a valid exercise of its power by the General Court under the Constitution of Massachusetts. The method of removal there established entered into the texture of the office of district attorney, constituted a part of its tenure and its limitations and was one of its characteristics under the law of Massachusetts. The office as thus constituted and limited was the one accepted by the respondent. He cannot complain of the statutes constituting and limiting the office voluntarily assumed by him. *Calhoun* v. *Massie,* 253 U. S. 170, 177. See *Interstate Consolidated Street Railway* v. *Massachusetts,* 207 U. S. 79, 84. In the dual system of government existing under the Constitution of the United States it is a fundamental attribute of a State that it may establish its own officers and provide for their election, selection, appointment and removal according to its own conceptions of what its public policy demands. It was said in *Wilson* v. *North Carolina,* 169 U. S. 586, at page 594, "In its internal administration the State (so far as concerns the Federal Government) has entire freedom of choice as to the creation of an office for purely state purposes, and of the terms upon which it shall be held by the person filling the office. And in such matters the decision of the State court, that the procedure by which an officer has been suspended or removed from office was regular and was under a constitutional and valid statute, must generally be conclusive in this court." The case at bar upon this point is covered completely by the authority of *Kennard* v. *Louisiana,* 92

U. S. 480, *Foster* v. *Kansas,* 112 U. S. 201, *Boyd* v. *Nebraska,* 143 U. S. 135, *Taylor* v. *Beckham,* 178 U. S. 548.

There is a suggestion in the "motion to dismiss and plea to the jurisdiction" that by the statute here assailed the respondent is denied the equal protection of the laws. No argument has been addressed to us in support of this point either orally or upon the brief. Under the settled practice of this court it is waived although it is stated that nothing is waived. Even if we were to treat the point as open, we are able to perceive no support for such a contention. As has been already shown, the office of district attorney under the Constitution and laws of this Commonwealth is under the control of the General Court so far as concerns the matters here in issue. Even as to general affairs less under its exclusive control than a public office, the Legislature has reasonable power of classification without being justly subject to the charge of passing statutes unequal in operation. The classification of officers in G. L. c. 211, § 4, is reasonable. It comprises those having an intimate relation to the administration of justice. It is within the principle of numerous cases. *Commonwealth* v. *Libbey,* 216 Mass. 356. *Ashley* v. *Three Justices of the Superior Court,* 228 Mass. 63, 78. *Commonwealth* v. *Titcomb,* 229 Mass. 14. *Middleton* v. *Texas Power & Light Co.* 249 U. S. 152, and cases collected at page 158. *Fifth Avenue Coach Co.* v. *New York,* 221 U. S. 467. *Provident Institution for Savings* v. *Malone,* 221 U. S. 660. *Mutual Loan Co.* v. *Martell,* 222 U. S. 225.

The argument, that any question of jurisdiction under the Constitution of the United States is involved, is in our opinion without substantial merit. It was said by the Supreme Court of the United States in *Gasquet* v. *Lapeyre,* 242 U. S. 367, at page 369, with ample reference to the authorities: "There is nothing in the clauses of the Fourteenth Amendment guaranteeing due process and equal protection which converts an issue respecting the jurisdiction of a State court under the Constitution and statutes of the State into anything other than a question of State law, the decision of which by the State court of last resort is binding upon this court." *Parker* v. *McLain,* 237 U. S. 469. *Moore* v. *Olsness,* 245 U. S. 627, and cases there collected dismissing writ of error to *State* v. *Taylor,* 33 No. Dak. 76.

Every rational presumption is made in favor of the validity of

every statute. The court will not refuse to enforce it unless its conflict with the Constitution is established beyond reasonable doubt. It will not be declared void unless it is impossible by any reasonable construction to interpret its provisions in harmony with the Constitution. *Perkins* v. *Westwood,* 226 Mass. 268, and cases collected at page 271. This fundamental and established principle is peculiarly applicable to the present statute. This statute has been a law of the Commonwealth for more than sixty-five years, having been first enacted in almost its present words by St. 1856, c. 173, § 7. It was amended in particulars not now important implying direct legislative affirmation by St. 1876, c. 209, and St. 1897, c. 224. It has been re-enacted by the General Court in four general revisions of the laws. Gen. Sts. c. 112, § 4. Pub. Sts. c. 150, § 4. R. L. c. 156, § 4. G. L. 211, § 4. Pursuant to its authority a district attorney of the Suffolk District was removed from office in 1861, *Commonwealth* v. *Cooley,* 1 Allen, 358, a register of probate and insolvency for the county of Middlesex in 1904, (see record in *In re Folsom* on file with the clerk of the Supreme Judicial Court for the Commonwealth), and in 1921 a district attorney of the Northern district, *Attorney General* v. *Tufts,* 239 Mass. 458. See *Bullock* v. *Aldrich,* 11 Gray, 206.

Before proceeding to judgment in any matter, it is the duty of this court of its own motion always to examine and decide in favor of its own jurisdiction. It is elementary that neither consent nor agreement of parties, nor the opinion of counsel, can justify the court in entering a judgment unless it is first "satisfied that it has been vested by the Constitution and laws of the Commonwealth with jurisdiction over the subject matter to be determined." *Peabody* v. *School Committee of Boston,* 115 Mass. 383. *Eaton* v. *Eaton,* 233 Mass. 351, 364.

This portion of the case has been examined at large. It is covered, however, in every essential point by the recent decision in *Attorney General* v. *Tufts,* 239 Mass. 458, which also was an information under this same statute for the removal of a district attorney. That case was fully argued by able counsel in behalf of the respondent. The decision was ample in its statement of reasons. The judgment of removal there entered was the most solemn determination possible that the statute was constitutional

and not subject to any infirmity. After renewed consideration of the subject, we remain satisfied with the conclusions there reached. They are affirmed. They are completely decisive of the contentions here presented.

The constitutionality of the statute and the jurisdiction of the court to act under it are firmly established.

According to the averments of the information, the respondent has held the office of district attorney for the Suffolk district by successive elections since November, 1909, the last election having been in November, 1919, for a term beginning in January, 1920. Several charges of misconduct set forth in the information relate to matters alleged to have occurred prior to November, 1919. Inquiry into such matters is within the scope of G. L. c. 211, § 4. Its terms are not restricted to the current term of office. The only tests established for removal by the statute are that "sufficient cause" exists and that the "public good" requires it. These are words of broad signification. They are not confined by any express limitation as to time. The power vested in a district attorney is very great. It is of the highest importance to the welfare of society that the incumbent of the office be free from corruption, a man of upright character, with a clear moral sense, and otherwise be fit to exercise for the common interest the vast prerogatives of his office. It hardly requires discussion to demonstrate that there may have been conduct in the office prior to the last election of such a nature that the public good may require, and that sufficient cause may exist for, removal. The grounds for removal must be cognizable by the courts in the exercise of judicial attributes. This point was fully considered in *Attorney General* v. *Tufts,* 239 Mass. 458. Every pertinent decision now called to our attention was then examined with care. They were not reviewed at length in that decision and need not now be considered in detail. As there pointed out, the weight of authority sustains the decision then made, to the effect that under the terms of a statute like G. L. c. 211, § 4, the scope of inquiry is not limited to acts committed during the current term of office. The decision then made is adhered to and affirmed.

The "motion to dismiss and plea to the jurisdiction" are denied and overruled. For convenience the several paragraphs of answer are treated as numbered from one to twenty-six, both inclu-

sive, in accordance with the paragraphing shown in the printed record. The paragraphs numbered two to five, both inclusive, ten to twenty-two, both inclusive, and twenty-four, of the answer, and so much of paragraphs numbered six and seven thereof as relate to the effect of the re-election or re-elections of the respondent, are adjudged insufficient in law and are overruled.

On December 27, 1921, and for nineteen court days thereafter, the informations were heard upon the merits by *Rugg*, C. J., *Braley, De Courcy, Carroll, & Jenney*, JJ.

During the hearing, on January 19, the respondent presented the following motion:

"Now comes the respondent, Joseph C. Pelletier, and says that paragraphs 5, 10, 15, 20 and 25 of the information do not set forth any facts upon which action of this court should be based, but on the contrary confess that the informant does not know and cannot allege what Joseph C. Pelletier did constituting the basis of any charges against him, and the allegations in said paragraphs are mutually contradictory in that it is said in said paragraphs, in certain parts thereof, that said Pelletier was guilty of malfeasance, misfeasance and nonfeasance, and in other certain parts thereof it is admitted that the informant does not know whether said Pelletier was guilty of malfeasance, misfeasance and nonfeasance.

"Wherefore, the respondent moves that the informant be ordered to elect as to which of the allegations in said paragraphs he will proceed upon, to wit, [here followed specific motions as to paragraphs 5, 10, 15 and 25 of the information,] that the informant elect whether he will proceed against the said Pelletier for malfeasance, for misfeasance or for nonfeasance in his said office in respect to" each case therein described, "and whether he will rely upon the allegation in the said paragraph that said Pelletier permitted and promoted the making of the groundless threats of criminal prosecution against persons" described therein, "or upon the allegation that from improper motives he failed to prosecute charges, having at hand or available by reasonable effort sufficient evidence for the proper prosecution of the charges against such persons, and whether the informant will rely upon the allegation in the said paragraph that the respondent wilfully abused the

authority of the said office or upon the allegation that he wilfully failed to discharge the duties thereof."

The motion was denied on January 20.

*J. W. Allen,* Attorney General, *James J. McCarthy, R. G. Dodge & A. Marshall,* Special Assistant Attorneys General, (*E. H. Abbot, Jr., A. Hurwitz, A. Lincoln & L. Goldberg,* Assistant Attorneys General, *& W. Flaherty,* Special Assistant Attorney General, with them,) for the informant.

*J. A. Reed* (of Missouri), *L. C. Boyle* (of Kansas) *& D. M. Lyons,* for the respondent.

At the close of the arguments, the court expressed to counsel their appreciation of the pains taken during the presentation of the evidence and of the assistance given by the closing arguments.

On February 21, 1922, the following decision and judgment of ouster were entered:

RUGG, C. J.   After the decision denying and overruling the respondent's motion to dismiss and plea to the jurisdiction, there has been a hearing at large upon the charges.  A majority of the Justices have sat nineteen days for the taking of evidence and listening to arguments on the evidence.  Several rulings of law were made during the trial, which bear upon main issues.  Other questions of law have arisen which must be decided.

Two informations were filed.  They were between the same parties and have been tried together.  So far as the subject matter is concerned, they might have been included in one information. The second contains but two charges.  It is in its nature an amendment of and supplementary to the first and main information. It is more convenient to treat them as one in the opinion and judgment, as they have been in the hearing and in all the proceedings, subsequent to the completion of the pleadings.  The court declined to hear them separately.  It is ordered that the two be con-. solidated into one.  *Lumiansky* v. *Tessier,* 213 Mass. 182, 189.

This judgment naturally falls into three divisions, the rulings of law, the findings of fact, and the conclusion.

### Rulings of Law.

1. The informant asked for a commission to take the deposition of a witness outside the Commonwealth.  Objection as matter of

law was made to the issuing of such a commission and to the use by the informant of a deposition so taken on the ground that this is a criminal proceeding and that hence the respondent has a right under art. 12 of the Declaration of Rights "to meet the witnesses against him face to face." That contention cannot be sustained. This information is not criminal in its nature. It lacks the essential incidents which characterize criminal proceedings. There is and can be no arrest. There can be no recognizance. There is no fine nor imprisonment. There is no punishment in any criminal sense. The removal from office is not a penalty inflicted upon the officer. It is a provision designed to protect the public from a corrupt, a dishonest, a dishonorable, an inefficient or an incapacitated public officer.

This is not an impeachment. This court has no jurisdiction over impeachments. Principles which would be pertinent in an impeachment have no relevancy to the present proceeding.

No trial by jury is required in this proceeding under the Constitution. The constitutional right to a trial by jury cannot be affected by mere forms of procedure. *Stockbridge* v. *Mixer,* 215 Mass. 415. *Boyd* v. *United States,* 116 U. S. 616. The information does not charge the respondent with an "offence" in the sense in which that word is used in art. 12 of the Declaration of Rights. It has been held that "offence" as used in a constitution is the equivalent of crime. *Campion* v. *Gillan,* 79 Neb. 364. Whether the word "offence" is used in our Constitution in a sense broad enough to include some matters not strictly criminal need not now be decided. *Chamberlain* v. *Hoogs,* 1 Gray, 172. *Frost's Case,* 127 Mass. 550. *Moore* v. *Illinois,* 14 How. 13, 19, 20. *United States* v. *Eaton,* 144 U. S. 677, 687. The statute in this respect protects every constitutional right of the respondent.

Numerous statutes providing for removal of public officers have been treated as civil proceedings without question. *McAuliffe* v. *Mayor & Aldermen of New Bedford,* 155 Mass. 216. *Barnes* v. *Mayor of Chicopee,* 213 Mass. 1. *Driscoll* v. *Mayor of Somerville,* 213 Mass. 493. *Butler* v. *Directors of the Port of Boston,* 222 Mass. 5. *Swan* v. *Justices of the Superior Court,* 222 Mass. 542. *Murray* v. *Justices of the Municipal Court of the City of Boston,* 233 Mass. 186.

The great weight of authority in other jurisdictions supports

the view that this is not a criminal proceeding. *People* v. *Meakim,* 133 N. Y. 214. *Rankin* v. *Jauman,* 4 Idaho, 53. *State* v. *Foster,* 32 Kans. 14. *State* v. *Medler,* 17 N. M. 644. *State* v. *Leib,* 20 N. M. 619. *State* v. *Brown,* 24 Okla. 433. *State* v. *Howse,* 134 Tenn. 67, 76. *State* v. *Leach,* 60 Maine, 58, 70. *Oesterreich* v. *Fowle,* 132 Mich. 9. *Skeen* v. *Paine,* 32 Utah, 295, 298. *Poe* v. *State,* 72 Texas, 625. *Randall* v. *State,* 16 Wis. 340. *In re Eaves,* 30 Fed. Rep. 21, 22. See cases collected in note, 20 Ann. Cas. 112. Statements that proceedings for removal of public officers from office are "penal," *Minnehaha County* v. *Thorne,* 6 So. Dak. 449, 455, *State* v. *Donahue,* 91 Neb. 311, or are "*quasi*-criminal," *State* v. *Gooding,* 22 Idaho, 128, 131, *Cobb* v. *Smith,* 102 Ga. 585, have not the effect of deciding that such proceedings are criminal in character. In *State* v. *Donahue* this was expressly recognized by the holding that charges need not be proved beyond a reasonable doubt. The words "penal" and "punitive" not infrequently are used respecting civil proceedings. *Sullivan* v. *Hustis,* 237 Mass. 441. *O'Connell* v. *O'Leary,* 145 Mass. 311. *Roberge* v. *Burnham,* 124 Mass. 277. *United States* v. *Regan,* 232 U. S. 37. There are few contrary decisions. *Thurston* v. *Clark,* 107 Cal. 285. *State* v. *Bland,* 144 Mo. 534, 555. *Daugherty* v. *Nagel,* 28 Idaho, 302. So far as these cases are not distinguishable by reason of the differing terms of constitution or statute upon which they depend, they are opposed to the great weight of authority.

The principles established in *Ashley* v. *Three Justices of the Superior Court,* 228 Mass. 63, wholly cover this point. It is indubitable that under our Constitution and laws this is a proceeding civil and not criminal in its character. It follows that depositions, in conformity to the statutes and rules of court, may be taken within or without the Commonwealth and may be offered in evidence by the informant. *United States* v. *Zucker,* 161 U. S. 475. *Grant Brothers Construction Co.* v. *United States,* 232 U. S. 647, 660.

2. The respondent, after the taking of evidence began, moved that paragraphs 5, 10, 15, 20 and 25 be stricken from the information on the ground that they contained alternative, hypothetical or disjunctive averments, or that the informant be ordered to elect upon which of the allegations therein contained he would rely. These paragraphs charge that the respondent, with respect

to several alleged conspiracies, "was guilty of malfeasance, misfeasance, and nonfeasance in his said office in that he did either permit and promote the making of groundless threats of criminal prosecution against divers persons . . . or else, having at hand or available by reasonable effort sufficient evidence for the proper prosecution of criminal charges against such persons, did from improper motives fail to prosecute said charges, whereby he did either wilfully abuse the authority of his said office or did wilfully fail to discharge the duties thereof."

Each of these several paragraphs concludes a group of five paragraphs, each group charging the respondent with being a party to a conspiracy to extort money from divers persons by abuse of his power as district attorney. Each group of charges is framed to describe as plainly as possible this scheme for wrong, the means by which it was designed to be accomplished and the degree of success attending it.

This is a civil and not a criminal proceeding. The rules of civil and not of criminal pleading are applicable to it. Therefore, cases like *Commonwealth* v. *Grey,* 2 Gray, 501, have no relevancy. The main fact charged is that the public good requires the removal of the respondent, for which malfeasance, misfeasance and nonfeasance in office are the sufficient causes. The alternative averments are ancillary to the main charge. They relate to matters difficult of ascertainment in advance of a final decision on the merits. It easily may be conceived that these matters might not be susceptible of complete proof and yet that the main fact might be fully established. The alternative averments have relation to the same ultimate fact of unworthiness to continue to hold the office. There is, therefore, no inconsistency in the charges laid in these several paragraphs, and cases like *Mullaly* v. *Austin,* 97 Mass. 30, and *Clapp* v. *Campbell,* 124 Mass. 50, are inapposite. Whichever aspect of the subsidiary facts as alleged may be proved, a sufficient ground for removal would be made out. Each of the charges to which the motion was directed relates to a single series of transactions culminating in a single wrong so far as concerns the respondent.

The meaning and intent of these several groups of charges is plain. It is not reasonable to think that the respondent could be in any degree misled or in doubt concerning the wrongs alleged

against him or the defences justly open to him. *Pettes* v. *Commonwealth,* 126 Mass. 242, 245. *Benson* v. *Commonwealth,* 158 Mass. 164. *Commonwealth* v. *Ismahl,* 134 Mass. 201.

It is provided in the practice act, G. L. c. 231, by § 7, cl. 4, that in a declaration, "if the nature of the case requires it, breaches may be assigned in the alternative," and by § 37, that "A party may allege a fact . . . alternatively." General principles of pleading established by the practice act, although in express terms governing only actions at law, have been treated. as applicable to other proceedings so far as pertinent, and are adopted by analogy, so far as practicable, in the interest of harmonious and simple practice. *Day* v. *Mills,* 213 Mass. 585, 587. *Strout* v. *United Shoe Machinery Co.* 215 Mass. 116, 119. *Commonwealth* v. *Hassan,* 235 Mass. 26, 31. The form of pleading adopted in these paragraphs of the information is in conformity in principle to numerous decisions. *Swett* v. *Southworth,* 125 Mass. 417. *Downey* v. *Lancy,* 178 Mass. 465. *Sargent* v. *Stetson,* 181 Mass. 371. *Ginn* v. *Almy,* 212 Mass. 486, 493. *Garden Cemetery Corp.* v. *Baker,* 218 Mass. 339.

This motion was denied when presented. Even if it be treated as having been renewed after the evidence was closed, the same result would follow. There was no sound ground for requiring the informant to elect upon which of the subsidiary alternative allegations he would rely. The reasons already stated demonstrate that the charge in its essence was single. The information being in compliance with our system of pleading, there was no justification for requiring election by the informant. See also *Commonwealth* v. *King,* 202 Mass. 379, 386.

3. The respondent sought to save exceptions to rulings of the court. In a proceeding like the present, no exceptions can be entertained. Parties cannot except to rulings made by the full court sitting to hear and decide a matter within its exclusive jurisdiction. Its rulings are not open to revision. *Attorney General* v. *Tufts,* 239 Mass. 458, 490.

4. A witness under cross-examination raised the question of privilege on the ground that he was the employee of a person licensed as a private detective. It is provided by G. L. c. 147, § 28, "Any person who is or has been an employee of a licensee and who divulges any information gained by him in the said em-

ployment except as his employer may direct, or as he may be required by law to do, . . . shall be punished by a fine . . . or by imprisonment . . . or both." That statute affords no privilege to an employee summoned as a witness in court. The words "as he may be required by law to do" mean that such employee may be required to give pertinent, relevant and competent testimony as to facts, which he is otherwise forbidden to divulge, concerning an issue under investigation in court. The statute was not intended to hamper the administration of justice but simply to provide for the licensing and regulation of private detectives and to protect them, so far as possible, from faithless employees. The witness was required to testify.

5. The foreman and another member of a grand jury were called as witnesses and testified in substance that an assistant district attorney among other things, while the jury was deliberating and before it voted, after the witnesses had closed their testimony, told the grand jury that one against whom an inquiry was being conducted by the grand jury was a brother of one of the assistant district attorneys, and also discussed with the grand jurors the evidence presented to them. This testimony was admissible and was not violative of the secrecy of grand jury proceedings. That secrecy is embodied substantially in the words of the oath of grand jurors to the effect that "the Commonwealth's counsel, your fellows' and your own, you shall keep secret." G. L. c. 277, § 5. *Commonwealth* v. *Woodward*, 157 Mass. 516. It was contended that the proffered evidence would transgress that portion of the oath which requires grand jurors to keep secret "the Commonwealth's counsel." It is the function of the court to charge grand jurors before beginning their duties as to their obligations and powers, and they properly may request the court at any time thereafter for further instructions in order to enable them intelligently to pursue their investigations. *Commonwealth* v. *Sanborn*, 116 Mass. 61. Yet it is the duty of the district attorney in appropriate instances to advise them concerning the law. But the district attorney cannot lawfully go outside the bounds of his own province. He cannot rightly attempt to influence the grand jurors in the performance of their duties. He ought not to express his own opinion or to make arguments. He cannot justly state any facts which have no relevancy to the guilt or innocence

of the particular person under inquiry, but which may have a tendency to influence the action of the grand jury on other grounds. He violates his own obligations when he does any of these things. The statement of the assistant district attorney was highly improper. Its only purpose and effect must have been to induce leniency on the part of the grand jury either in voting to find any bill or in the offence for which indictment was voted, and thus to create an improper influence. When the conduct of the district attorney with the grand jury is plainly outside the sphere of his duty, his counsel is not "the Commonwealth's counsel" as those words are used in the oath. See in this connection *Stiles* v. *Municipal Council of Lowell*, 233 Mass. 174. It does not come within the protection of the oath of secrecy. Under these circumstances in a case like the present, when justice may be outraged or go unsatisfied unless such conduct before the grand jury can be disclosed, the ban of secrecy may be removed by the court and the truth be ascertained. When such facts are disclosed, the reasons for the sanction of secrecy to proceedings before the grand jury no longer obtain. Those reasons are (1) that the utmost freedom of disclosure of alleged crimes and offences by prosecutors may be secured; (2) that the temptation to the accused for perjury and subornation of perjury arising from knowledge of facts presented to the grand jury may be diminished; and (3) that the escape by flight of those indicted, which would be likely to follow publicity as to the investigation by the grand jury, may be averted. These and kindred reasons for the secrecy of grand jury proceedings have no applicability in an inquest into the conduct of the district attorney himself where he is charged with grave wrongs as ground for his removal. He cannot seek shelter behind that rule of secrecy to prevent inquiry into his malfeasance or misfeasance in office. When the reason for the rule of secrecy ceases, the rule itself becomes inoperative. Any other principle would permit a dishonest, corrupt and vicious district attorney to use the great power of his office and his influence with the grand jury as an engine of oppression and be entirely safe from inquiry under a seal of secrecy which would prevent investigation. That is not the law. That would be perversion and not enforcement of the rule. This is the plain result of our own decisions. *Commonwealth* v. *Hill*, 11 Cush. 137, 140.

*Commonwealth* v. *Mead,* 12 Gray, 167. *Attorney-General* v. *Tufts,* 239 Mass. 458. It is supported by the great weight of authority in other jurisdictions. *Miller* v. *State,* 42 Fla. 266. *Shattuck* v. *State,* 11 Ind. 473. *Williams* v. *State,* 188 Ind. 283, 303–307. *State* v. *Faulkner,* 185 Mo. 673, 696. *State* v. *Putnam,* 53 Ore. 266, 268, 269. *State* v. *Will,* 97 Iowa, 58. *In re Miller,* 17 Fed. Cas. 295, No. 9,552. See note, 12 Am. St. Rep. 911–919 and cases there collected.

The foreman of the grand jury further testified that cases presented before a grand jury were not voted and acted upon as presented; that evidence was heard in half a dozen cases, more or less according to their length, and then it was "customary" for the district attorney or his assistant to give an outline of the evidence and to refresh the memory of the jurors by summarizing briefly the facts of each case "when we get to voting." This also was a manifest perversion of grand jury proceedings. The grand jury is preserved as one of the safeguards of liberty by art. 12 of the Declaration of Rights in a clause plainly conformable to the words of Magna Charta. *Jones* v. *Robbins,* 8 Gray, 329, 342. That article, as was pointed out in *Commonwealth* v. *Harris,* 231 Mass. 584, 586, was designed in part to prevent judges from overawing the grand jury or interfering in any way with the independence of its action. Its purpose was sedulously to preserve in its integrity the absolute freedom of the grand jury from every outside influence. It would be a mockery of constitutional rights and obligations to permit the district attorney, because of his presence with the grand jury, secretly to exercise a control which the court is forbidden to exercise even openly. Although fortunately there has been no occasion hitherto for an express decision on the point by this court, other authorities are to this effect.

It was said by Mr. Justice Field, in an oft quoted charge to a grand jury, 2 Sawyer, 667, 678: "The district attorney has the right to be present at the taking of testimony before you for the purpose of giving information or advice touching any matter cognizable by you, and may interrogate witnesses before you, but he has no right to be present pending your deliberations on the evidence. When your vote is taken upon the question whether an indictment shall be found or a presentment made, no person

besides yourselves should be present." The rule in this Common-
wealth is not quite so strict. While the prosecuting officer has no
right to stay with the grand jury during their deliberations and
must withdraw on their request, nevertheless he may remain by
their permission and his presence does not invalidate their pro-
ceedings. But he must keep silent unless his advice or opinion
on a matter of law is sought. He cannot participate in the de-
liberations or express opinions on questions of fact or attempt in
any way to influence the action. His duty is ended when he has
laid before the grand jury the evidence and explained the meaning
of the law. The weight and credibility of the evidence is wholly
for the grand jury. He should refrain from expressing an opinion
on the facts even if asked. The grand jury ought not to delay
action upon cases heard by them until their memory has become
so misty or blurred as to require a rehearsing of it from any one.
For the district attorney to make such statement is to substitute
his memory for recollection of the grand jurors and is to that ex-
tent to usurp their function. Such conduct on the part of a prose-
cuting attorney is as reprehensible as to offer direct advice con-
cerning the issues depending for decision by the grand jury. It
affords abundant opportunity for craftiness and insidious influ-
ence. It is subversive of fundamental principles of the grand jury
procedure for the district attorney or his assistants thus to partici-
pate in its deliberations and discussions. "Office and Duty of
Grand Jurors" by Davis, 20, 21. *United States* v. *Wells*, 163 Fed.
Rep. 313. *United States* v. *Rintelen*, 235 Fed. Rep. 787. *Le-
Barron* v. *State*, 107 Miss. 663, 674. *Commonwealth* v. *Bradney*,
126 Penn. St. 199, 205. *Maginnis's Case*, 269 Penn. St. 186, 197,
198. See cases collected in 20 Cyc. 1338.

6. To affect the credibility of a witness called by the informant
there was offered a record of his conviction of crime in the District
Court of the United States for the Southern District of New York.
The conviction of crime in the courts of the United States sitting
in New York may be shown under G. L. c. 233, § 21, to affect
the credibility of a witness provided the record comes within the
terms of the statute. Such evidence is not confined to conviction
in the courts of this Commonwealth. *Rittenberg* v. *Smith*, 214
Mass. 343. The word "conviction" in said § 21 implies "a judg-
ment and sentence of the court upon a verdict or confession of

:guilt." Mere verdict of guilty is not enough. *Commonwealth* v. *Gorham,* 99 Mass. 420, 422. "Nothing less than a final judgment, conclusively establishing guilt, will satisfy the meaning of the word 'conviction' as here used." *Commonwealth* v. *Kiley,* 150 Mass. 325, 326. *Commonwealth* v. *Meehan,* 170 Mass. 362.

The papers presented as the record show a verdict of guilty and sentence, prosecution of a writ of error to the United States Circuit Court of Appeals, mandate from that court affirming the judgment of the district court, order and decree of the district court making said mandate its judgment, and an order that the defendant surrender himself into the custody of the United States marshal on or before August 8, 1921, and an order to that marshal to deliver him over for imprisonment in accordance with the sentence, and an order for stay until October 10, 1921. A certificate from the clerk of the United States Supreme Court was offered, to the effect that a petition to that court for certiorari in the same case was denied on October 24, 1921.

The judgment of the Circuit Court of Appeals in a criminal case is final. The Judicial Code, 36 U. S. Sts. at Large, 1133, § 128. *MacFadden* v. *United States,* 213 U. S. 288. That judgment stood unaffected by the petition for a writ of certiorari, that having been denied. *Duart* v. *Simmons,* 236 Mass. 225, and cases collected at page 227. Execution of the sentence might be stayed in order to permit the prosecution of the writ of certiorari or even for a pardon. *United States* v. *Lynch,* 259 Fed. Rep. 982. The only stay granted according to the record expired on October 10, or October 11, 1921, and does not appear to have been renewed.

Whether this is a record of a final judgment of conviction is a question of federal practice. Without pausing to review the federal decisions, we are of opinion that the record proffered is of a final judgment. *Morris* v. *United States,* 107 C. C. A. 293, 296. *Ex parte Wilson,* 114 U. S. 417. *Ex parte Thurston,* 233 Fed. Rep. 847. *Bernstein* v. *United States,* 165 C. C. A. 659, 660, *S. C.* 249 U. S. 604. *Holden* v. *Minnesota,* 137 U. S. 483, 495. *Schwab* v. *Berggren,* 143 U. S. 442, 451. There appears to us to be nothing at variance with this conclusion in *Omaha Electric Light & Power Co.* v. *Omaha,* 133 C. C. A. 52, 59, *United States* v. *Ellicott,* 223 U. S. 524, 539, *United States* v. *Lynch,* 259 Fed. Rep. 982, *In re Cain,* 126 C. C. A.

182. Compare G. L. c. 279, § 4, and *Commonwealth* v. *Lobel,* 187 Mass. 288.

7. At the conclusion of the testimony, the respondent presented a motion that "all the testimony given by the various witnesses as to acts and declarations of persons other than the respondent, which were not done or made in the presence of the respondent or by his direction, be stricken from the record," accompanied by numerous specifications.

In several instances the informant was permitted to introduce the declarations of a person or persons charged with being a co-conspirator or co-conspirators with the respondent on the promise of the informant that evidence to warrant a finding of such conspiracy would be produced. Evidence of that nature was produced in every such instance. A question of fact then was raised whether a case had been made out or not. As a matter of law on the whole evidence there was sufficient to justify the inference that they were parties to a conspiracy with the respondent. *Commonwealth* v. *Waterman,* 122 Mass. 43. *Commonwealth* v. *Riches,* 219 Mass. 433, 438. It was said in *Commonwealth* v. *Smith,* 163 Mass. 411, at pages 417, 418, "A conspiracy may be proved by circumstantial evidence, and that is the usual mode of proving it, since it is not often that direct evidence can be had. The acts of different persons who are shown to have known each other, or to have been in communication with each other, directed toward the accomplishment of the same object, especially if by the same means or in the same manner, may be satisfactory proof of a conspiracy." Most, if not all, of the charges of conspiracy against the respondent included Daniel H. Coakley as a co-conspirator either alone or with others. Mr. Coakley was a member of the bar. There was plenary evidence that he and the respondent were close personal, social, professional and political friends. There was evidence that their acts converged toward a common end when so charged in the information. When others were named as co-conspirators, there was sufficient evidence under settled principles of law to raise a question of fact whether the conspiracy existed. *Attorney General* v. *Tufts,* 239 Mass. 458, 493, 494. *Commonwealth* v. *Riches,* 219 Mass. 440, 442. Although we do not find that the conspiracy was proved as a matter of fact in every case where it was charged, it could not be ruled as matter of law in any case

that there was not evidence tending to show and warranting as matter of law a finding that a conspiracy existed as charged.

The order of introducing the evidence was discretionary with the court. *Commonwealth* v. *MacKenzie,* 211 Mass. 578, 581.

It is well settled that, where there is evidence of a conspiracy, the acts and declarations of each conspirator in pursuance of the common design, whether in the presence or in the absence of the fellow conspirators, are admissible against all. *Commonwealth* v. *Smith,* 151 Mass. 491, 496. *Commonwealth* v. *Stuart,* 207 Mass. 563, 567.

There was considerable evidence concerning financial transactions of Mr. Coakley and the respondent. This related to withdrawals of large sums of money by Mr. Coakley from his bank accounts, or the possessing by him or his agents of large sums of cash in bills, and the deposit soon after by the respondent of similar amounts of bills to his credit in his bank account. In one instance the withdrawal by Mr. Coakley was of a larger sum than that deposited by the respondent, but there was evidence that the exact difference was paid to a third person. These sums deposited in bills by the respondent varied from $1,000 to $5,000. They were reasonably near in point of time to the receipt by Mr. Coakley, in connection with cases named in the information, of sums of money largely in excess of any amount justly due for legitimate services rendered by him or for any just claims due to or from his clients.

These transactions all were competent evidence. The respondent and Mr. Coakley were intimate friends constantly having personal and professional relations with each other. There was evidence tending to show that they were conspirators to exert the power of the district attorney to extort money, to terrorize people into surrendering causes of action and otherwise to abuse that office. The use of bills in such large amounts rather than checks, in the practice of the law or in the ordinary transactions of life, is so unusual as to arouse suspicion in connection with other circumstances. Neither the respondent nor Mr. Coakley was engaged in a kind of business where in the natural course of normal affairs large sums of bills would be used instead of checks. There is rational ground for a probability or presumption in connection with all the attendant factors that there was a relation of cause and effect

between the abuse by the respondent of the authority of the district attorney and the receipt by Mr. Coakley of sums of money far larger than he was entitled to receive on any just basis, on the one hand, and the deposit of considerable sums in bills by the respondent shortly after the withdrawal by Mr. Coakley of similar sums, on the other hand. A legitimate inference of that nature might have been drawn by the tribunal charged with finding the facts. Proof by such an inference is no less sound proof than direct testimony. *Doyle* v. *Boston & Albany Railroad,* 145 Mass. 386. *Commonwealth* v. *Doherty,* 137 Mass. 245. *Barrett* v. *Bruffee,* 182 Mass. 229. *Commonwealth* v. *Asherowski,* 196 Mass. 342, 346. Of course this evidence standing alone does not prove criminal conduct. But there were strong accompanying circumstances of an independent character tending to show wrongdoing. It is not necessary that every piece of evidence admitted should be sufficient by itself to prove the main fact in issue. "Evidence which would be colorless if it stood alone may get a new complexion from other facts which are proved, and in turn may corroborate the conclusion which would be drawn from the other facts." *Commonwealth* v. *Mulrey,* 170 Mass. 103, 110. *Commonwealth* v. *Coyne,* 228 Mass. 269, 272.

It follows from what has been said that the motion to strike out evidence, so far as it concerns charges found to be proved, must be denied. It is not necessary to consider in detail the specifications of that motion as to evidence respecting charges in which the finding on the facts is in favor of the respondent. Evidence on these charges in any event has done the respondent no harm. It is not necessary to discuss the other aspects of that motion. It is enough to say that as matter of law the evidence to which it refers cannot be altogether rejected. This general ruling is subject to one exception. Certain evidence apparently competent when admitted in the charge concerning the Peters case turned out later to be hearsay. That testimony is stricken out. The motion in this particular is granted. In all other particulars the motion is denied.

8. There was evidence in several cases tending to show that the respondent interfered in civil litigation between private parties with whom he had no relations for the purpose of compelling the plaintiff to surrender civil rights, and to abandon civil actions.

The law respecting such conduct is clear. By virtue of his office the respondent had no right to interject himself into private litigation. The threat to bring or the actual bringing of a civil action from whatever motive and without probable cause is not a crime at common law. *Commonwealth* v. *Mosby,* 163 Mass. 291. *Knight* v. *Sawin,* 6 Maine, 361. Malicious abuse of civil process without probable cause only affords ground for civil action. *Lindsay* v. *Larned,* 17 Mass. 190. *Cardival* v. *Smith,* 109 Mass. 158. *Malone* v. *Belcher,* 216 Mass. 209. *Quartz Hill Consolidated Gold Mining Co.* v. *Eyre,* 11 Q. B. D. 674. *Wiffen* v. *Bailey & Romford Urban District Council,* [1915] 1. K. B. 600. It is only by express legislation that such conduct becomes criminal. See for example G. L. c. 246, § 30. There was no statute rendering criminal the bringing or the prosecution of any of the civil actions with which the respondent interfered. He had no shadow of right to threaten criminal prosecution in order to bring about the settlement of civil claims. *Commonwealth* v. *Coolidge,* 128 Mass. 55. G. L. c. 265, § 25.

9. It is charged in paragraph 30 of the information that the respondent, "having sufficient evidence in his possession or available by reasonable effort, has from improper motives failed to prosecute or cause to be prosecuted by his assistants persons who have committed crime within his jurisdiction." While some of the specifications under this charge were being tried, the informant offered evidence tending to show that the respondent engaged in a conspiracy to accomplish that end, although there was no charge to that effect in the particular paragraph or specification. That evidence was competent although its tendency was to establish the commission of another wrong in addition to that charged. This is well settled law. *Commonwealth* v. *Scott,* 123 Mass. 222, 225, 234, 235. If the confederacy in a common enterprise was found to be proved, then the acts and words of the co-conspirators directed toward the furtherance of the common purpose were competent. *Commonwealth* v. *McDonald,* 147 Mass. 527.

10. It has been intimated in argument by one of the counsel for the respondent that vicious influences and unreasoning prejudice have instigated the prosecution of this information. There is not a shadow of basis for that suggestion. It is not supported by a shred of evidence. Such insinuations have no place in an in-

vestigation like the present. The respondent stands or falls upon his personal character and official conduct as shown by evidence at the trial, and upon these alone. Nothing except his own evil actions established by plenary proof can justify his removal from office. *Attorney General* v. *Tufts*, 239 Mass. 458, 492.

11. The respondent did not testify. He called no witnesses. He offered no evidence. He rested at the conclusion of the evidence introduced by the informant. There was ample evidence introduced by the informant tending to prove that the respondent was guilty of many of the charges set forth in the information. This evidence, if believed, constituted abundant proof of malfeasance and misfeasance in office arising from motives utterly unworthy of an upright man. The case shown by the evidence vitally affected the official conduct and personal character of the respondent. Instant impulse, spontaneous anxiety and deep yearning to repel charges thus impugning his honor would be expected from an innocent man. Refusal to testify himself or to call available witnesses in his own behalf under such circumstances warrants inferences unfavorable to the respondent. It is conduct in the nature of an admission. It is evidence against him. This principle of law has long been established and constantly applied. The reason is that it is an attribute of human nature to resent such imputations. In the face of such accusations, men commonly do not remain mute but voice their denial with earnestness, if they can do so with honesty. Culpability alone seals their lips. The law simply recognizes the natural probative force of conduct contrary to that of the ordinary man of integrity. *Commonwealth* v. *Clark*, 14 Gray, 367, 373. *Smith* v. *Whitman*, 6 Allen, 562, and cases cited at page 564. *Commonwealth* v. *Goldstein*, 180 Mass. 374, and cases cited at page 376. *Howe* v. *Howe*, 199 Mass. 598, 603. *Berenson* v. *Conant*, 214 Mass. 127, 131. *Rioux* v. *Cronin*, 222 Mass. 131, 135.

The constitutional protections against the drawing of adverse presumptions from failure to testify applies only to criminal cases: Declaration of Rights, art. 12. G. L. c. 233, § 20, cl. 3. *Commonwealth* v. *Richmond*, 207 Mass. 240, 248. It is utterly irrelevant to a civil proceeding such as the present one. The principle that in civil causes no unfavorable inferences can be drawn against one who fails to testify or to offer evidence when no case has been made out against him, illustrated by *Poirer* v. *Terceiro*, 224 Mass.

435, 437, and *Bishop* v. *Pastorelli, ante,* 104, is wholly foreign to the case at bar, where there is much evidence to support the contention of the informant and to call for explanation.

### Findings of Fact.

1. It is charged in paragraphs 1 to 5 of the information that the respondent conspired with Daniel H. Coakley and others to extort money from the Emerson Motors Company, or persons engaged in promoting that company, by threats of criminal prosecution, and that, to prevent such prosecution, the sum of $20,500 was paid to said Coakley, and that the respondent thus was guilty of malfeasance, misfeasance and nonfeasance in office either by making groundless threats of criminal prosecution or by failing to prosecute just criminal charges, all from improper motives. This case is also one of the specifications under paragraphs 28 and 29 of the information to the effect that the respondent knowingly permitted divers persons to use the authority of his office for the purpose of coercing others to settle civil claims or to give up money or property or both and has knowingly aided and abetted persons to extort or to attempt to extort money or property from other persons by threats of criminal prosecutions.

The facts are that one Matches in June, 1916, engaged in Boston in selling stock in the Emerson Motors Company. He retained one Carroll as his attorney, who organized a corporation for promoting the sale of the stock. He advertised extensively in newspapers and by circulars. The newspaper advertisements contained a picture or pictures of the factory or proposed factory of the Emerson Motors Company, and other representations tending to show that the stock of that company was a desirable and profitable investment. Matches employed several salesmen in connection with his office. He also hired a vacant store, where was exhibited an automobile purporting to have been made by the Emerson Motors Company. The advertisements attracted the attention of one McGarr, chief inspector of the Boston police department, who on September 22, 1916, after conference with the respondent, assigned one of his inspectors to investigate. He visited the office of Matches and the store where the car was exhibited. On October 1, another inspector, with the approval of the respondent, was sent to New York to investigate the truth of the statements in the newspaper advertisements affecting the value of

the stock of the Emerson Motors Company. That inspector re-
turned to Boston on October 4. In the meantime Matches be-
came disturbed by the investigation and consulted Mr. Carroll,
who asked Mr. Coakley to ascertain whether any investigation
was pending. Matches also telephoned to New York to persons
connected with the Emerson Motors Company. The New York
attorney for that company came to Boston on October 3. He
conferred with Mr. Coakley, who told him that that company was
in a good deal of trouble, that there was an indictment pending
before the grand jury then in session and he did not know whether
it could be stopped, but that he was an intimate friend of the
respondent, and had done much toward causing his election as
district attorney, and could get favors from the district attorney
not available to others. With respect to fees Mr. Coakley said he
wanted $500 by way of retainer, and then $20,000 contingent
upon his being able to avert prosecution of the company, that
sum to be deposited with some bank or with Mr. Carroll, so that
there would be no difficulty about his getting it if he succeeded in
stopping the prosecution. Mr. Coakley said that one with his
influence with the district attorney must be well paid, and urged
the necessity of haste because of the impending indictment. The
New York attorney replied that he could not engage to pay so
large a fee, but must get authority from his clients. An interview
was had on the same day with the respondent, at which were
present Messrs. Coakley, Carroll, Matches and the New York
attorney. The respondent asked numerous questions about the
company and Matches and the New York attorney explained
the situation fully from their standpoint and offered to bear the
expense of sending a trained engineer to visit the plant of the
company in New York to verify their statements. The respond-
ent asked Mr. Coakley if he had been retained in the case, to which
the reply was, "Not exactly yet," that the New York attorney
was returning home that night to ascertain and he wished the
respondent would hold the matter until he heard from New York.
The respondent asked Mr. Coakley to keep in close touch with him
and let him know what the Emerson Motors Company was going
to do. The respondent said in substance to Mr. Coakley that he
thought the latter was not going to get into that case, but was
going to let the respondent go ahead with its prosecution. The

New York attorney returned home on that night, October 3, and on the morning of October 5 returned with $20,500 in bills, which he handed to Mr. Carroll, who deposited the money in his own bank, advising Mr. Coakley of that fact and paying him $500 as retainer. On October 5, also, the two inspectors who had investigated the case, one in Boston and the other in New York, had an interview with the respondent, in which they told him all that they had discovered. The substance of their report was to the effect that many of the leading statements made in the advertisements concerning the Emerson Motors Company were untrue. There was testimony to the effect that certain other conditions were made by Mr. Coakley to be carried out by the company, but there is nothing to indicate that the respondent took pains at any time to see that they were carried out. On the afternoon of October 6, Mr. Carroll, after a telephonic talk with Mr. Coakley and with the respondent, wrote to the New York attorney of the Emerson Motors Company, "I have just talked with District Attorney Pelletier (4 P.M.). He has examined the facts as presented to him, and now has an entirely different conception of the situation. I am glad to tell you that he has assured me he found in the facts we have been able to lay before him no ground for proceedings against the Emerson Motors Company." This letter contained the substance of what the respondent had said to the writer of the letter. On October 7, Mr. Carroll paid Mr. Coakley $15,000, keeping by agreement of the latter $5,000 for himself. Mr. Coakley deposited $15,000 in his bank account on October 9. On October 11, 1916, a check for $5,000 drawn by Mr. Coakley to the order of his office manager, Daniel H. Sugrue, was paid in cash at the bank. Two days later the respondent visited his safe deposit box, not having been there since September 25, and on October 25 he next again visited his safe deposit box and a few moments later deposited $5,000 in bills in his bank account. On October 19, 1916, in reply to a letter of inquiry by one Stimpson about the Emerson Motors Company, the respondent wrote that "There is no complaint here against the concern you mention. . . . I have noticed by the newspapers within the last few days that this company is willing to open its books and affairs to all inquirers."

These facts demonstrate that there had been a violation of St. 1916, c. 149, § 1 (see now G. L. c. 266, § 91), forbidding under

penalty of a fine of not less than $10 nor more than $500 the making of untrue, deceptive or misleading statements in advertisements designed to promote the sale of securities, of which the respondent well knew and had ample evidence. The circumstance that $20,500 was brought in bills from New York to meet the demand of Mr. Coakley, is highly suspicious. Untainted transactions are not commonly conducted in that way. That sum of money was grossly in excess of the fair value of any professional services that might be rendered in "averting" such a prosecution. Within a day after the arrival of that money, the respondent gave assurances to be transmitted to those who had paid it that he found "no ground for proceedings against the Emerson Motors Company," notwithstanding the convincing report to the contrary made to him by the inspectors of the Boston police department a few hours before. A few days later he wrote an outside inquirer there was no complaint in his office against that concern. We do not find it necessary to decide whether the $5,000 in bills deposited by the respondent in his bank on October 25 was a part of this money or not. It is clear to us that there is direct, positive and indissoluble connection between the payment by the New York people of the $20,500 demanded by Mr. Coakley and the stifling of all further investigation by the respondent. It would not have happened if the money had not been paid as demanded by Mr. Coakley. Whatever may have been the pressure brought to bear upon the respondent by Mr. Coakley, it was a wilful and unlawful abuse of the authority of his office for the respondent to smother the prosecution of such a crime under all the circumstances. The facts warranted no such disposition of the case. The respondent is guilty on these charges.

2. It is charged in paragraphs 6 to 10 of the information that the respondent conspired with Mr. Coakley and others to extort from Warren C. Daniel, a dealer in securities, a large sum of money by threats of criminal prosecution for offences against the laws of this Commonwealth, and abuse of his office by the respondent in various ways to that end. This case also is one of the specifications under paragraphs 28 and 29 of the information. The charges are similar to those in the Emerson Motors Company case.

One Daniel of New York, a promotor of the Metropolitan Motors, Incorporated, amongst other corporations, had an office

in Boston in the autumn of 1916 for the sale of stocks. Rumors came to him in New York that criminal proceedings were impending against him or his company in Boston. In consequence, a business associate named Bond came to Boston, made inquiries, and ultimately saw Mr. Coakley, to whom statement was made of apprehension as to complaints pending in the district attorney's office and of desire to delay proceedings until a hearing could be had. Mr. Coakley, saying that he would telephone to the respondent, addressed some one on the telephone, "Hello, Joe; I am coming right over; I want to see you." He then left his office for fifteen or twenty minutes and on returning said that he had had the matter put over until next week. Conversation ensued wherein Mr. Coakley referred to having handled a similar matter for the Emerson Motors Company for which he received $20,500, and suggested a similar fee. In consequence of these occurrences Mr. Burnstine, the New York attorney for Warren C. Daniel and the Metropolitan Motors, Incorporated, interviewed Mr. Coakley in Boston on the Monday or Tuesday following, narrated all that Bond had told him and went over the whole situation in detail. On the afternoon of that same day, in consequence of inquiries and statements made by one of the firm of lawyers who were correspondents in Boston of Mr. Burnstine, the respondent asked Mr. Burnstine and his Boston correspondent, Mr. Coakley and others connected with the affair, to come to his office. There the whole conversation between Mr. Burnstine and Mr. Coakley was repeated to the respondent. That was a long conversation, but the parts of it now material are that Mr. Bond had seen Mr. Coakley a few days before, had told him that he understood that proceedings were pending in the district attorney's office; that he desired an opportunity to show to the district attorney that his company was doing a legitimate business and not violating the law, and that Mr. Coakley had thereupon seen the respondent and procured an adjournment of the matter until Wednesday or Thursday following, and that Mr. Coakley had said that was so; that Mr. Coakley had tentatively suggested a fee of $10,000, the exact amount to be determined after examination of the books of the Metropolitan Motors, Incorporated, and to be proportioned to the amount paid him in the Emerson Motors Company matter; that Mr. Coakley had said that he was a very close friend of the

respondent, socially and politically, and had been for years, and that some people said he was the district attorney and not Mr. Pelletier, and that Mr. Coakley took more umbrage at that than did the respondent.   Mr. Burnstine said that the suggested fee of $10,000 seemed to him entirely out of proportion to any legal service involved, to which Coakley replied, "yes, he appreciated that; that notwithstanding his closeness to the district attorney—you can appreciate how it is.   A man only has so many favors with a man in public office, and he feels that if he uses up one of these favors in a matter that he ought to be well paid for it." Inquiry was made as to the nature of the criminal complaint, but no definite information was obtained.   As Mr. Burnstine went through the conversation part by part he turned to Mr. Coakley, inquiring if his statements were correct.   Mr. Coakley took issue only with the statement that he had said to Mr. Burnstine that there was something pending in the district attorney's office against his clients.   Mr. Burnstine then said in substance, "Although possibly you did not say that in so many words, you did tell me that on last Friday you told Mr. Bond that you were going to see the district attorney, and on returning had said that you had adjourned the matter.   It could not have been a non-existent matter.   It must have been a matter that had some being in order to be adjourned.   You gave me the very clear impression that there must have been something in the district attorney's office in order to be adjourned."   To this Mr. Coakley made no reply except that "he assented to the reasonableness and logic of that situation."   At this interview Mr. Coakley and the respondent addressed each other by their first names and the respondent said he had known Mr. Coakley for a great many years and that they were close friends.

At the conclusion of the interview the respondent became angry, said there was nothing to the matter so far as he could see but jealousy of certain lawyers about the large fees of other lawyers.   Mr. Burnstine asked if there was anything pending in the district attorney's office against his clients, and expressed a desire, if there was, to be given an opportunity to meet it before it became serious, whereupon the respondent replied, that no one could get any information or explain matters and left the room.

The respondent did not challenge the statement that Mr.

Coakley had seen him a few days before and had procured a postponement of a grand jury inquiry into the transactions of the clients of Mr. Burnstine. He did not brand as false the assertion that there were proceedings on foot in his office against the clients of Mr. Burnstine. He expressed no word of criticism, denial or refutation concerning the influence and favoritism which, as just reported to him by Mr. Burnstine in the presence of Mr. Coakley without contradiction but with admission of its truth, the latter had said on that very morning that he possessed with the respondent and capitalized as basis for extraordinary fees. This was not an instance of idle gossip, vain rumor, or irresponsible slander. All the persons who had made statements on the matter were in the presence of the respondent. The entire conversation of that morning was reproduced in his hearing as accurately as the memory of Mr. Burnstine and of Mr. Coakley, the only participants, would permit. There was substantial agreement between them as to its essentials. The man was right before him, who stood sponsor for the truthful report of that conversation with all its damaging charges and insinuations against the respondent. He was a member of the bar of a sister State, apparently of good standing and of mature experience.

It is utterly inconceivable to us that an honest man, under such circumstances as confronted the respondent, should not instantly, in some decisive and unmistakable way, have denied the accusations made against him face to face in his own office. All the circumstances called on him to speak. His silence upon the vital points of the conversation and his seizure upon the fictitious and immaterial issue of jealousy among lawyers as to fees, constituted strong evidence against him. *Greenfield Bank* v. *Crafts*, 2 Allen, 269, 273.

We find that these charges are supported. The conspiracy is established. *Commonwealth* v. *Rogers*, 181 Mass. 184, 194. It is of no importance in this connection that it was not successful and that no money was paid to Mr. Coakley and nothing more was heard of criminal proceedings against the clients of Mr. Burnstine. *Commonwealth* v. *Coolidge*, 128 Mass. 55, 58. It is also immaterial whether an investigation was undertaken against Daniel and the Metropolitan Motors, Incorporated. The false representation that proceedings were pending, made with intent

to extort money, was enough.  R. L. c. 207, § 25 (see now G. L. c. 265, § 25).  *Commonwealth* v. *Murphy*, 12 Allen, 449.

3. It is charged in paragraphs 11 to 15 of the information in effect that the respondent conspired with Mr. Coakley and aided and abetted him to frighten one Dorothy Coté by threats of criminal prosecution to abandon a civil action brought by her for the conversion of an automobile.  This case also is one of the specifications under paragraphs 28 and 29 of the information.

The facts concerning these charges are that Miss Coté consulted a young attorney at law in Boston, named McCallum, about an automobile given to her by one Lawrence, which the Locomobile Company of America (hereafter called the company) refused to deliver to her.  She produced a letter from Lawrence, which recited that he had given her the automobile and that it was marked with her monogram D. C.  There had been relations of intimacy between her and Lawrence, which were interrupted at that time. Written demand was made upon the company for the automobile on March 11, 1918, and copy was sent to Lawrence.  On March 13, the company refused to deliver the automobile on the ground that Lawrence claimed to own it.  On March 15, 1918, the respondent called Mr. McCallum on the telephone and said that he had been consulted by Daniel H. Coakley concerning the action of Miss Coté against his client, Mr. Lawrence.  Reply was made that there was no action against Mr. Lawrence, but only a demand on the company for the return of the automobile.  In consequence, an interview was had wherein the respondent characterized Miss Coté as a lewd woman who had received many thousand dollars from Lawrence within the past two years and was now trying to blackmail him out of the car and more money.  Mr. McCallum showed the letter from Lawrence to his client, which the respondent said was in his opinion no evidence of a gift.  The respondent advised him to see Mr. Coakley, which he did.  During this conference Mr. Coakley made much the same statements as had the respondent, saying, however, that he had been paid a retainer of $1,000 by a brother of Lawrence, and that he proposed to have some criminal action taken against Miss Coté by the district attorney.  The written evidence of gift of the automobile from Lawrence to Miss Coté was shown to Mr. Coakley.  He was assured that no action of any kind was contemplated against

Lawrence, but only the getting of the automobile or its value from the company.  In conclusion Mr. Coakley told Mr. McCallum that "This is a matter you don't want to get mixed up in, and I want this girl to forget this car and return it to Lawrence, and forget all about Lawrence."  Mr. McCallum promised to see his client.  Within an hour or two the respondent again telephoned Mr. McCallum, saying that Mr. Coakley had informed him of the conference and that no definite conclusion had been reached, and that Mr. Coakley desired to bring Lawrence to see him, but that he would try to postpone the matter a few days.  After conference with his client, Mr. McCallum wrote Mr. Coakley, sending copy to the respondent, stating that she had made no claim against Lawrence, but only against the company, and suggesting that, if any criminal action was to be taken against her, it should be started in the municipal court in the ordinary way.  On March 18, 1918, action for conversion of the automobile was begun against the company, returnable in court on the first Monday of May following.  On April 2 the respondent again telephoned Mr. McCallum that he proposed to present the Coté case to the grand jury and would like to know if he cared to testify; that he had talked with a couple of girls and believed that McCallum was "sort of involved in this thing."  In great surprise Mr. McCallum asked how he was involved, but the respondent refused to tell him.  No ground whatever appears for any such insinuation.  Summonses were issued to several of Miss Coté's girl friends to appear before the grand jury on April 5, 1918, whereby Miss Coté was much disturbed, said she was not afraid, but was not going to drag her friends into any such thing for an automobile, and would drop her case against the company.  Mr. McCallum talked with the respondent and said his client would drop the civil action, if that would prevent the presentation of her case to the grand jury.  The respondent replied that he did n't stop indictments for defendants, that "the complainant has to be satisfied; and really I think this matter has gone too far now, I don't think I can stop it."  Miss Coté then decided to drop her case against the company contrary to the advice of her counsel, conferred with Mr. Coakley, communicated her desire to him, signed papers presented to her by him, surrendered jewelry given her by Lawrence and did whatever Mr. Coakley required of her.

In her presence Mr. Coakley telephoned the respondent that he had changed his mind about her, that she was a "perfect lady," that he wanted to help her and wanted the whole thing dropped. He gave her a list of the witnesses summoned and sent or caused to be sent instructions to them not to appear before the grand jury. He told her in substance that the case was finally settled, that there would be no grand jury proceedings and nothing further would be done. In fact, no witnesses ever were called before the grand jury and there were no criminal proceedings.

Lawrence was then, and during the period of his relations with the Coté woman, had been a married man. But there is no evidence of any purpose on her part and certainly none on the part of Mr. McCallum to attempt to blackmail Lawrence. G. L. c. 265, § 25. A civil action against Lawrence, even if unfounded, would not have been criminal. *Commonwealth* v. *Mosby*, 163 Mass. 291. But her only civil action was against a third person and not against Lawrence.

The main and dominating cause for the conduct of Miss Coté in giving up her civil claim, was the threat of criminal prosecution made by the respondent pursuant to a conspiracy between him and Mr. Coakley to produce that result. A motive contributing in part to the same result was her hope of reconciliation with Lawrence, a hope subsequently realized by marriage to him. But the existence of this ancillary motive does not affect the legal aspects of the conduct of the respondent. Even if he had not succeeded in making her give up her civil action or if she had given it up for some other reason than his threats, the respondent nevertheless would have been guilty of a combination with Mr. Coakley to use illegal means to bring about the desired result and of the actual abuse of the powers of his office to that end.

The respondent is guilty of these charges.

4. In paragraphs 21 to 25 of the information the respondent is charged with conspiracy with Mr. Coakley and William J. Corcoran, then the district attorney for the northern district, and others, to extort money from Curtis W. Emery, Elizabeth Emery and Jennie S. Chase, and the use and abuse of the powers of his office in various ways to accomplish that result. It is also charged in paragraph 33 and a specification thereto that from improper motives the respondent procured an indictment against Robb,

Emery and LeClair for conspiracy to accuse of crime. These cases are also included in the specifications under paragraphs 28 and 29. The indictment against Robb, Emery and LeClair is one of the specifications under paragraph 33 of the information to the effect that the respondent from improper motives has procured indictments which ought not to have been procured.

A summary of the relevant facts, as we find them, is as follows:

One Papineau was married in Webster in this Commonwealth to a daughter of Mrs. Jennie S. Chase. They had one child. Curtis W. Emery won the affections of the wife, who obtained a divorce *nisi*, on the ground of cruel and abusive treatment, on November 15, 1912, made absolute on May 15, 1913. She and Emery were married in Connecticut on December 31, 1912. She then went to live with her mother in Boston and Emery with his father in Medford. A child was born to them in June, 1913. They were married again in Maine in August, 1913. Papineau began proceedings in Worcester County concerning the custody of the children. He also brought two actions, one against Emery and the other against Mrs. Chase, for alienation of the affections of his wife. These actions both were settled and Papineau released all claims upon the receipt of $1,000. It does not appear by whom that money was paid. Final judgment in favor of each defendant had been entered on the court records in June, 1915. In these matters Papineau had acted on the advice of other counsel. Feeling dissatisfied, he consulted Mr. Coakley in October, 1915. He told him the story of his troubles with his wife and Emery, of the divorce, of the early marriage of his wife and Emery, of the birth of their child, of the probate proceedings and of the civil actions and their settlement. He told the amount of the property of Mrs. Chase as being about $300,000. When this was mentioned Mr. Coakley gave instructions that he must not be interrupted, had Papineau state items of her property so far as he could, and had him give a detailed narration of his entire life from his marriage. Inquiry was made by Mr. Coakley as to the place of begetting of the child born in June, 1913. When Papineau expressed the view that it must have been Boston, Mr. Coakley took Papineau to the office of the respondent and introduced him, saying, "Shake hands with a client of mine, . . . Mr. Papineau may want to use you in a case before long." The respondent re-

plied, "I shall be glad to do anything I can for you." Papineau asked Mr. Coakley how much his fee would be. Mr. Coakley answered in substance that he need not be troubled about that and that if everything came out as he expected there would be no occasion for worry.

It is plain from the testimony of Papineau that he went to Mr. Coakley in the hope of getting criminal proceedings against Emery for the wrongs done to him, and not for the purpose of getting money. The settlement of the two actions for alienation of affections of his wife was known to Mr. Coakley.

During his early interviews with Papineau, Mr. Coakley spoke of his intimate personal relations with the respondent and of his influence with him to get him to do what he desired. Mr. Coakley also arranged an interview between Papineau and District Attorney Corcoran. With the latter, arrangements were soon after made by Mr. Coakley for summoning witnesses before the grand jury at Cambridge, where Mr. Coakley decided it was better to indict. Among the witnesses summoned was Mrs. Chase, the mother of Mrs. Emery, an aged woman, who was held at the court house in Cambridge several days and examined before the grand jury under circumstances calculated to cause her great distress and terror. Mr. Coakley was at Cambridge while this investigation, which was unreasonably delayed and protracted, was going on, and apparently was in most intimate association with District Attorney Corcoran.

At the November sitting, 1915, two indictments were returned to the Superior Court of Middlesex County against Emery and his wife, formerly Mrs. Papineau, one for adultery and the other for lewd and lascivious cohabitation in 1913 at Medford. The defendants were arraigned in January, 1916. Mr. Robb, a young man and an office associate of Emery, was his attorney. To act with him Daniel J. Gallagher, an older lawyer, was retained. Mr. Gallagher consulted with Mr. Corcoran and Mr. Coakley several times. Once he telephoned to Emery that Mr. Coakley would give them twenty-four hours in which to pay $50,000. He told his client of probable terms of imprisonment for Mr. and Mrs. Emery and the consequences to their children, likely to ensue from prosecution of these indictments. He urged a settlement by the payment of $50,000 to Mr. Coakley. His advice was not

accepted and he ultimately was discharged. Other attorneys were retained, who advised against a settlement.

One LeClair, who at that time operated a detective agency, was engaged in behalf of Emery to watch Papineau, to cultivate his acquaintance and gain information as to his proposed moves. To that end one Patron, an employee of LeClair, was sent to Webster, where Papineau then lived. Within a few days he disclosed himself to Papineau as a friend of Mr. Coakley, whom they both visited at once. Patron continued to pretend to be working for LeClair in behalf of Emery and to send him reports, but in fact was doing all he could to aid Mr. Coakley. He was soon discharged by Emery or his attorney. In February, 1916, the respondent conducted before the Suffolk grand jury a hearing at which Emery, Mr. Robb, LeClair, the proprietor of the detective agency, and Patron were summoned as witnesses. LeClair declined to testify. Mr. Robb and Emery both testified fully. Their evidence showed that they had been engaged in no criminal conduct. On the testimony of Patron alone Robb, Emery and LeClair were indicted on February 12, 1916, for having conspired falsely to accuse Papineau of having committed adultery. This was the only case, so far as shown by stenographic records, which the respondent personally presented to the grand jury in January or February of that year. Stenographic record was made only in the more important cases. Papineau had nothing to do with this indictment and knew nothing about the proceeding until he read of it in the newspaper.

No money has ever been paid Mr. Coakley by or in behalf of Mrs. Chase or the Emerys. Although frequently asked, Mr. Coakley has never vouchsafed any explanation to Papineau and has never told him why none of the indictments have been tried. The Middlesex indictments were filed without the knowledge or request of the defendants in June, 1917. A *nolle prosequi* was entered on the Suffolk indictment in April, 1919, without the knowledge or request of the defendants. Here again, the fact that the respondent has not offered any explanation by his own testimony or that of other witnesses, has probative force against him. It is manifest that the Suffolk indictment was not brought in the public interest. Although procured by the respondent in person, he never brought it to trial and caused it to be nolprossed.

The evidence convinces us that a conspiracy was formed by Messrs. Coakley, the respondent and others to extort a large sum of money from Mrs. Chase, an unoffending old woman. The active part of the respondent in this conspiracy was to procure an indictment for a serious crime against the husband of the daughter, who was also the father of the infant grandchild of Mrs. Chase, and his attorney and an employee of his, supplementing other indictments against the daughter and the husband of the daughter and thus to attempt to coerce Mrs. Chase through fear for her near kindred, into paying a large sum of money. Papineau was used merely as a tool to this end. His purpose was not to get money for himself but to get punishment for Emery. Any civil claim which Papineau had against Mrs. Chase had been adjusted and final judgment entered in her favor before he consulted Mr. Coakley. He made no claim for money against her and no hope of financial benefit was ever held out to him. The scheme to wring money from Mrs. Chase was devised to satisfy the greed of others than Papineau. Whatever may be said about the conduct of Emery before his marriage, there is nothing to indicate that Mrs. Chase had committed wrong. The use of the machinery of the criminal law even to extort money from Emery would have been an abuse of official power by the respondent. To set it in motion to terrorize or to aid in terrorizing Mrs. Chase shocks the moral sense of every right thinking person. The processes of law, which are designed to defend the innocent and to protect society against the wrongs of the criminal, have been used as instruments of oppression in an attempt to wrest money from the blameless and aged.

The respondent is guilty on these charges.

5. It is charged in paragraph 26 that the respondent from improper motives failed to prosecute Merrill W. Shute for embezzlement, and in paragraph 27 that the respondent made false statements concerning the case and caused docket entries to be altered. Shute confessed that he had stolen or embezzled in Boston $15,285.65 from Mrs. Brackett, an aged woman resident in Bangor, Maine. There was plenary evidence of the crime outside the confession. Shute was indicted in thirty-one counts on December 9, 1915, for larceny. When counsel for Mrs. Brackett first saw the respondent, he said that a lawyer friend of his in

Maine had asked to be heard before an indictment be found. The respondent refused to bring the matter to trial until an equity suit in Maine growing out of the transaction had been concluded. He promised, however, to bring Shute "to justice" "as soon as this civil matter is disposed of." A docket memorandum was made, "Civil suit pending, continued until suit settled." The civil suit in Maine was disposed of finally in November, 1916, and on November 24, 1916, the respondent entered a *nolle prosequi* on the indictment against Shute. This action was not known to the attorneys for Mrs. Brackett until one of them in February, 1917, urged the respondent to try the Shute case, when he replied, "I nol prossed that six months ago. . . . I made up my mind that there wasn't much in it anyway." While there was evidence that by some mistake the date of entry of the *nolle prosequi* was shown in some places and at various times as June 24, 1916, instead of November 24, 1916, we are not satisfied that this was due to the wrongful act of the respondent.

The conduct of the respondent was disingenuous. It arouses a just suspicion. The crime of Shute was of considerable magnitude. His turpitude appears to have been unquestioned. An old woman lost a large sum of money through his malefactions. The respondent had given his promise that Shute should be brought to justice. It is difficult to account for the actions of the respondent. Nevertheless there is no evidence as to the motive which actuated the respondent in his conduct. His relations with his lawyer friend in Maine are not shown to have been corrupt. The burden of proof is on the informant. We are not satisfied that these charges are proved.

This case is also included as a specification under paragraphs 30 and 32 of the information. For the reasons already stated the same conclusion is reached on those specifications.

6. It is charged in paragraphs 28 and 29 of the information that the respondent knowingly permitted divers persons to use the authority of his office for the purpose of coercing divers other persons to settle civil claims or to give up property or money or both, and knowingly aided and abetted persons to extort or to attempt to extort money from other persons by threats of criminal prosecution.

One of the specifications under these paragraphs is the case of

Benjamin Piscopo. He has been a resident of Laconia, New Hampshire, since 1911, but prior to that time was a resident of Boston for about twenty-five years. He had had domestic troubles for several years, which culminated in the granting of a divorce to him in New Hampshire in November, 1917. During 1917, his chief counsel was a distinguished lawyer of that State, with whom was associated another leading member of the New Hampshire bar. In the spring of 1917, Piscopo consulted a lawyer in Boston named McIsaac, whom he had known for many years, about a trifling matter. At that time Mr. McIsaac spoke about the divorce case and said he thought he could be of assistance in that matter, whereupon Piscopo told him to go ahead and see what he could do. A part of the family troubles of Piscopo was the question of alimony and support of his children. A settlement was made of these matters by counsel outside of court. Very large sums of money were paid on these accounts by Piscopo, or secured by mortgage upon his real estate. The amount ultimately paid was $100,000, more than had once been suggested by way of offer in behalf of the wife and children and refused by Piscopo. As compared with this offer, the final settlement was disadvantageous to Piscopo. During the period of not exceeding eight months, while Mr. McIsaac was acting as one of the attorneys for Piscopo, the latter saw or telephoned to him perhaps fifty times, and he had to do with the giving of a mortgage by Piscopo. After the divorce was granted and the affairs settled, which was in November, 1917, Piscopo saw Mr. McIsaac about his bill. The respondent had rendered no services to Piscopo and had not been engaged by him, all of whose relations had been with Mr. McIsaac alone. Mr. McIsaac said that his bill was $35,000. Piscopo thought the figure mentioned was a joke, was astonished to find it was meant seriously, and refused to pay it. He had several conferences with Mr. McIsaac, at one of which, held by previous appointment, the respondent was present. At this time Piscopo owned a large amount of real estate in Boston, including a hotel which he operated and which he testified had cost $500,000. Piscopo said the bill worried him and he wanted to settle it. After some general conversation concerning it, the respondent said, (according to the testimony of Piscopo,) "You kind of slow to pay that bill." "You better pay it." "Ain't

you got a hotel?"  "Don't you know you can get in a lot of trouble?"  "We can investigate that hotel."  "We can make a lot of trouble for you."  Mr. McIsaac said, "Joe, here he can put somebody watch that hotel."  Piscopo testified that the manner of the respondent during the talk showed that "he mean business."  In view of this conversation and knowing the position and power of the respondent, Piscopo was much alarmed at what might happen to his hotel and his large investment in it.  He realized how easy it would be for them to cause him loss and distress by inciting violation of liquor laws and other regulations and in other ways.  Moved by these considerations, although believing the amount grossly in excess of the value of any services rendered by Mr. McIsaac, he finally settled by paying at different times $5,000, $14,000 and a note for $2,000, which amounted with interest when paid to $2,060, being a total of $21,060.  It was agreed at the trial that these several amounts were deposited by Mr. McIsaac to his individual account in the Federal Trust Company and that one half of each of these amounts was later paid to the respondent and deposited in his individual account in the Old Colony Trust Company "and not in any partnership account of Pelletier, McIsaac & Webber, . . . and that no part of the payments went into Mr. Webber's account."  Counsel for respondent said, "They were partners at the time, weren't they?" To which counsel for informant replied, "We, of course, do not admit the partnership at that time."  Thus the evidence was left.  There was no evidence of a partnership.  But it is of no consequence in this connection whether there was a partnership or not.

In either event the conduct of the respondent was a bald use of his official position for his private financial profit.  Having regard to the nature of the service rendered to Piscopo by Mr. McIsaac, the time spent by him, and all the other circumstances, the demand of $35,000 and the receipt of $21,000 in payment for services was exorbitant.  The threat of the district attorney under all the circumstances was likely to be most effective in extorting money.  The payment of the money by Piscopo, the amount paid and the receipt of one half of it by the respondent, all are admitted. The testimony of Piscopo is direct and positive that the respondent threatened him that he would be the victim of his official power

if he did not pay the money. The respondent has not denied that testimony. He did not call Mr. McIsaac as a witness to deny it. There is no escape from the conclusion that the respondent used his official power as district attorney wrongfully to extort money for his own financial enrichment. He is guilty on this charge. Even if the charge of $21,000 had been just and the respondent entitled to one half of it, it would have been an abuse of the power of his office to threaten Piscopo as he did, to compel him through fear to pay that sum.

7. Another specification under paragraph 28 is the case of Frank R. Peters. On May 26, 1916, Peters, then a wool merchant in Boston, at the invitation of a woman who lived in the same block and who had come to his apartment in light attire, went to her apartment to perform a trifling service for her. Some improper familiarities occurred, but there was before us no evidence of an attempt to ravish or anything beyond a simple assault. About a week later, Peters was summoned by telephone to the office of the respondent, who said that a serious complaint had been lodged against him and that he was accused of an assault with intent to rape. Peters told his version of the incident. The respondent said in substance that he should have to present the evidence to the grand jury and have him indicted "if you can't fix it up in some way." Peters asked his advice and the respondent replied, "I would advise you to see Coakley and see if you can't get it fixed up. He represents the complainant." Peters retained counsel but did not personally see Mr. Coakley. Demand was made upon Peters for the payment of $50,000 to $75,000 to settle the claim of the woman. Peters did nothing and was indicted for assault with intent to rape on July 8, 1916. In the following autumn, being informed that the case would shortly be called for trial, Peters again saw the respondent and asked if he was going to try the case. The respondent replied in the affirmative and added, "Why haven't you fixed this thing up? You have had all summer to do it and you haven't done a thing about it. Why haven't you seen Coakley and fixed it up?" Thereafter, on November 16, 1916, $10,000 was paid in behalf of Peters to Mr. Coakley and a release of all civil liability, signed by the woman alleged in the indictment to have been assaulted and by her husband, running to Peters, was delivered to his counsel. The

respondent on the following day entered a *nolle prosequi* on the indictment against Peters.

Here again are the incidents of the corrupt relation between the respondent and Mr. Coakley to use the power of the office of the district attorney to secure settlement of civil claims to the satisfaction of Mr. Coakley, and the instant extinguishment of the criminal proceeding when the civil settlement has been secured. The respondent first sends for the victim, informs him of the impending criminal prosecution, advises settlement with Mr. Coakley, when that is not made procures an indictment, and immediately upon such settlement, snuffs out the indictment. We find the respondent guilty upon the charge concerning this case.

This case also is one of the specifications under paragraph 33 of the information to the effect that the respondent has procured indictments which ought not to have been procured. It is plain that this indictment was procured from an improper motive and not in the interests of the public welfare. In view of the finding just made this charge need not be further considered.

8. Another of the specifications under paragraphs 28 and 29 is the case of Myer Berman.

In the autumn of 1916 the respondent sent a police officer, specially assigned to assist him, to the Higgins Hotel in Boston. That hotel was described as "a second class hotel," where there was then a bar for the sale of intoxicating liquors, a dining room and about thirty-six rooms for guests. Myer Berman and Isaac Gordon were interested as licensees, proprietors and managers. The respondent instructed the police officer, "You go down to the Higgins House; they are keeping two registers there, and there is one of them under the counter, and you bring that to me." The police officer got the hotel register and handed it to the respondent, who so far as appears never returned it. The police officer never heard from the respondent about the matter afterwards. Berman and Gordon immediately consulted Mr. Coakley, who had theretofore acted as their attorney. He told them that they would be called by the respondent on that day or the next and to say nothing to him. Shortly thereafter, the respondent by telephone summoned Myer Berman to see him. There were present at the interview the respondent, Myer Berman and Gordon. The respondent said: "It is kind of funny books that you keep

there. . . . You will hear from me." Berman replied, "I will see Mr. Coakley about it," and the respondent said, "All right." Berman and Gordon then consulted Mr. Coakley, who said, "Wait, I'll call up Mr. Pelletier and see what he will say about it." Thereupon he called the respondent by telephone and said, "Hello, Joe!" and told him that Berman and Gordon were in his office, and concluded by saying, "Joe, don't do anything until you will hear from me. . . . Wait, don't indict him till you hear from me." Neither Berman nor Gordon ever heard from the respondent again. Thereafter, William J. Corcoran, then district attorney of the middle northern district, saw Berman in Mr. Coakley's office and demanded $50,000 in settlement of a claim which he purported to have growing out of the circumstance, as was said, that "a married woman came in with a strange husband and slept in the hotel over night." Mr. Coakley advised a settlement and after a brief interview between Mr. Corcoran and Mr. Coakley, the latter said that $35,000 was the least sum that would be accepted; that the grand jury would be in session next day and if the matter was not settled Berman and his two sons and Gordon would all "be indicted to-morrow." One of his sons, then a student in college, was working in the hotel, and the other son, a leather merchant, was at the hotel frequently. As a result of all this, $35,000 was paid to Mr. Coakley, $15,500 out of the account of the Higgins Hotel and the rest by a son of Myer Berman, and was deposited on November 6, 1916, in Mr. Coakley's bank account. On November 7, Mr. Coakley withdrew $5,000 from his bank and on November 8 the respondent deposited $5,000 in bills on his own account. In July, 1917, a further sum of $15,-000 was demanded by Mr. Coakley of Berman, the former saying that "You are in wrong again. . . . It is practically the same thing as before," and again threatening that if it was not paid, "you will have to be indicted, you and your sons and Gordon." The sum demanded was paid, less the discount, due to the fact that the money was raised on a time note made by Berman and guaranteed by Mr. Coakley, who arranged the matter with the bank. On or about the time of the payment of each of these sums of money, the rooms in the hotel were by direction of Mr. Coakley closed for a few days. No indictment, complaint or grand jury inquiry was ever made against Berman or the Higgins Hotel.

This matter was commenced by the respondent. He sent the police officer for the hotel register, summoned Berman and Gordon to his office, and conveyed to them the thinly veiled threat that he proposed to prosecute them by the remark about "funny books" and by saying, "You will hear from me." If he did not know it before, he learned both from Berman and from Mr. Coakley that the latter was counsel in the affair. It is inconceivable that Berman would have paid this great sum of money if he had not been overawed by the menacing conduct of the respondent, within whose power it lay practically to destroy a hotel business such as that in which he was largely interested. It is equally unthinkable that an intelligent district attorney should have done what the respondent did in the way and under the circumstances shown, except for the sinister purpose of aiding in the extortion of money. The facts in view of the refusal of the respondent to offer any explanation by his own or other testimony indicate that he received $5,000 of this money. But even if he did not, his culpability is fully proved.

We find that the respondent consciously used the powers of his office to aid in this extortion of money and that the respondent is guilty of this charge.

9. Another specification under paragraphs 28 and 29 of the information is the case of Walter A. Buckley. Buckley was employed as a sole leather salesman by Ackerman and Brummel, leather merchants in Boston. He had a written contract of employment with them for a period of years at a fixed annual salary. Two years before it expired, this written contract was modified, as claimed by Buckley, by an oral agreement for a percentage on profits in addition to the salary. Toward the end of 1916, he asked his employers for a part of this percentage, the oral modification of the written contract then was denied by them, Buckley terminated the contract and placed his claim against his employers in the hands of Edward L. Logan, a Boston attorney. Buckley had conducted important negotiations in behalf of his employers. His annual salary was $9,000 for several years. His percentage on profits according to his claim amounted to $55,000. His attorney notified his employers of his claim. They, through their regular attorney, Mr. Goulston, retained Mr. Coakley. Then Buckley was summoned by telephone to the office of the respond-

ent. There he met one Simmons. Buckley asked if he could have his attorney there. The respondent said, "No; I could have the attorney there or I could be there personally, but the two of us could not be there together." The respondent then read to them many sheets of what purported to be a transcript of a dictaphone conversation between Brummel and Simmons, wherein the latter claimed he could settle the Buckley claim. Simmons denied that such conversation ever took place. While the three were there a young woman stenographer of Ackerman and Brummel came in, the respondent saying, "You are the young lady that has been giving Mr. Buckley information, both business and social, about Ackerman and Brummel." She made no reply, but Buckley told the respondent the source of some of his information. After reading the sheets, the respondent said to Buckley, "I have indicted people for less than this." A few days later the respondent called an intimate friend of Buckley to his office, inquired of him what he knew of Buckley's claim against his employers, and said, "It looks as though I would have to indict Buckley." This was reported to Buckley, as was intended by the respondent.

Buckley was then forming a corporation for the purpose of going into business, was apprehensive that any proceedings by the respondent would ruin him, and for that reason decided to give up his claim against his employers. He signed an acquittance to that effect, went with his attorney with it to an office in the suite of the district attorney in the court house. In the court house he signed another paper. The respondent remarked to Buckley, "It would have to come to him eventually, and it would be better to have it settled that way and go on and do my new business." Mr. Coakley also was there. The respondent and Mr. Coakley, with Mr. Logan, in an adjoining room concluded the transaction. This was on February 6, 1917. On the witness stand in the present trial in response to questions by counsel for the respondent, Buckley released his counsel, Mr. Logan, from the seal of professional secrecy and gave full consent that he testify as to the whole affair. On February 7, 1917, Mr. Goulston, in behalf of Ackerman and Brummel, paid Mr. Coakley $15,000 by check, which was on the same day deposited to the latter's bank account. He withdrew on the same day $6,250 in bills from the bank, of which $3,750 were paid to Mr. Goulston. On the day

following, the respondent deposited $2,500 in bills in his bank account. No indictment was ever found against Buckley. There is no evidence that he ever committed any crime, and he testified that he was not conscious of having committed any.

Here again the facts indicate that the respondent received $2,500 of this money. But even if he did not his culpability is fully proved.

The inference is irresistible, in view of the intimate personal relations between the respondent and Mr. Coakley as shown by other findings, the groundlessness for making any criminal charge against Buckley, the delivery of the acquittance of the civil claim and the conclusion of that matter in the office of the respondent, the release by Buckley of his own attorney from the professional obligation of secrecy, the failure of the respondent to call Mr. Logan as a witness, the respondent's own refusal to testify, and all attendant conditions, that the respondent is guilty on this case. He used the power of his official position to coerce Buckley, through threat of a criminal prosecution, into surrendering a civil claim for damages against clients of Mr. Coakley.

10. Still another specification under paragraphs 28 and 29 is the case of Edward C. Tripp. A civil claim was made against him by a woman for breach of promise of marriage. It appears to have been without any basis and, after learning the facts from his attorney, was abandoned by the first lawyer who undertook it. Soon after he received a telephonic message from the respondent to come to his office. He consulted his attorney, Mr. Stinson, who told the respondent that he with his client would call. The respondent said it was not necessary for Mr. Stinson to come, but yielded when the latter insisted on being present. At the interview Mr. Stinson stated his client's case, showing plainly that there could be no action for breach of promise. The respondent said that Mr. Coakley had the case in charge and was pressing for an indictment or for prosecution, that since Mr. Tripp was a married man the charge, which was adultery, was serious, but that in his opinion, in view of the standing of Mr. Tripp in the community, the public interest did not demand prosecution and "that if he could satisfy Coakley or call him off or relieve the pressure . . . that personally he did not think it his duty to take it to the grand jury, and would not, and that he should think

that the advisable thing to do." Mr. Stinson inquired what was to prevent the woman from going to the lower court for a warrant even though settlement were made with Mr. Coakley, and the respondent replied that that was a very remote chance. At the conclusion of the conversation Mr. Stinson stated that he should advise his client to go to Mr. Coakley and tell him of the interview with the district attorney and that no settlement would be made. Subsequently civil action was brought by Mr. Coakley, but it was not entered in court and no money ever was paid by Mr. Tripp on account of the claim.

The relations between the respondent and Mr. Coakley, as demonstrated by other evidence on the information, which of course we have a right to consider on any charge to which they are relevant, give strong color to the argument that the respondent undertook to use the power of his office to aid in the settlement of the purely civil claim made by a client of Mr. Coakley, and that his attempt to that end was frustrated by the courageous stand taken by Tripp and his attorney. Nevertheless, the respondent appears to have been convinced by the facts presented by Tripp and his attorney that the public interests did not require an indictment and to have expressed that view at the time and to have taken no further steps although nothing was paid to Mr. Coakley. Hence we are not convinced that this specification is proved.

11. A further charge under paragraphs 28 and 29 relates to the case of Charlotte Broad. She asserted a claim against one Waxman for breach of promise of marriage. Apparently there were illicit relations between the two. Seemingly there is ground for inference that she hoped to get money from him on the strength of those relations. After conference between her counsel and the respondent and correspondence between herself and the respondent, she finally wrote the latter a letter from New York of her own free will so far as shown stating that she had no claim against Waxman and that she had been misadvised. The acts of the respondent in intermeddling were without justification and were highly reprehensible. But upon consideration of all the evidence we are not convinced that the respondent is brought within those charges as drawn.

12. In paragraph 30 it is charged that the respondent, having

sufficient evidence in his possession or available by reasonable effort, has from improper motives failed to prosecute or to cause to be prosecuted by his assistants persons who have committed crime within the Suffolk district.

One of the specifications under this charge is the case of John Prendergast. The relevant facts are that Agnes M. Bennett, a young working woman, on the evening of April 17, 1916, had been at an entertainment given by the church in a hall connected with St. Mary's Church on Cooper Street in Boston. She left a little before eleven o'clock, was accompanied by several girl friends, all of whom soon parted from her on the way to their several homes. She was crossing Warren Bridge toward the place where she lived, alone, when she was followed and accosted by Prendergast with insulting remarks, which she resented. He continued to talk to her, using vile names and foul language, finally assaulting her. She defended herself. She called to her assistance three men who happened to be passing and ultimately Prendergast was arrested and identified by the three men as well as by Miss Bennett. Prendergast then denied all wrongdoing, and told the arresting officer that he would "strip him of his buttons." Shortly thereafter in the Municipal Court he defended on the ground of alibi, but was convicted of accosting and sentenced to four months' imprisonment and appealed. Prendergast seemed to be able to exert considerable influence. Numerous people more or less prominent tried to induce Miss Bennett to drop her charge. She refused because she felt that to do so would reflect upon her good name, and that she ought to prosecute it not only for herself but for other women who might be alone on the streets at night. Later a man believed by her to be a brother of Prendergast and others followed her at night. As she reported to the respondent, "these people are hounding me, and watching me, and trailing me, to get something on me." Witnesses once were summoned to the Superior Court but were dismissed with the information that the case had been "put back." Late in the year Miss Bennett went to see the respondent. She told him the facts of the accosting, the treatment to which she had been subjected afterwards and the efforts of various persons of influence who had urged her to drop the criminal complaint. He refused to tell her when the case would be tried, but tried to get her not to press it. Again she

saw the respondent in February following, asking him for information concerning her case. He said, " Oh, it is coming up sometime." No communication was had with her again by the respondent or his office, and in December, 1919, the respondent entered a *nolle prosequi* on the complaint.

This is a plain case of an outrageous insult to a virtuous and honest working girl on a public street in Boston. There could be no doubt about the fact of the accosting and a somewhat serious assault. It was proved by abundant evidence from disinterested witnesses, as well as by the convincing narration of the affair by the entirely credible young woman. Prendergast showed no penitence whatsoever. He began his denial and defiance of law when arrested within a few moments after the offence. The shadowing of Miss Bennett by persons apparently acting in his behalf and the efforts to suppress her natural resentment at his conduct through the pressure of such influence as he could set in motion, was of itself proof that he was not the type of offender to be wholly exonerated from all blame.

It is manifest to us that influences sinister in their nature alone could have led the respondent to treat as he did the crime committed against Miss Bennett. Whether those influences were political, social, financial or other need not be proved. No explanation has been offered by the respondent. No upright prosecuting attorney could permit such a crime to go utterly unpunished, such a defendant to be set absolutely free, and vouchsafe no explanation to the insulted and injured young woman.

The case is an illustration of the truth that, when the power of a district attorney is perverted from its true purposes of protecting the public and is prostituted to the dispensation of favors and submission to those capable of exercising influence, it is the poor, the obscure and the blameless who suffer. That law which ought to be the shield of honesty and the guard of innocence becomes the protector of lawlessness and the weapon of oppression.

The respondent is guilty on this specification.

13. Another specification under paragraph 30 relates to the case of Perry and others. This refers to automobile thefts in Boston. The evidence on this charge is voluminous. Summarily stated, it shows that there were investigations of automobile

thefts being conducted in Suffolk, Middlesex and Essex counties, and that certain persons interested as actual or possible defendants in criminal prosecutions that were or might be instituted, paid $15,000 to Mr. Corcoran for himself and others for the defence of all cases in the three counties. There was ample evidence to warrant indictments in Suffolk County for automobile thefts, and indictments were voted by the grand jury, but before they were reported, at the solicitation of the respondent, Perry, one of the persons against whom an indictment had been voted, was admitted to the grand jury to testify, and that thereafter the grand jury changed their view and voted no indictment. While there are incidents in the conduct of the respondent quite out of the ordinary in connection with this case, we are not satisfied on consideration of all the evidence that this charge is proved.

14. It is charged in paragraph 31 of the information that, in violation of his oath of office, the respondent has from improper motives nolprossed or permitted assistant district attorneys to nol pros cases which should have been prosecuted. One of the specifications under this charge is the case of Thomas Nee and others for breaking and entering. This case is also specified under paragraphs 34 and 35 of the information. There was ample evidence to warrant a conviction even though one of the witnesses died before the case was reached for trial. In April, 1921, an agent of the department of corrections found in the files of the case a memorandum signed by an assistant district attorney recommending probation for the defendants on plea of guilty. Thereupon, the chairman of the board of parole wrote to the respondent to the effect that Nee was then on parole from the reformatory, where he had served three times, and that if he was guilty of breaking and entering either by plea or verdict, his permit to be at liberty would be revoked. Subsequently the memorandum as to probation was withdrawn and another assistant district attorney entered a *nolle prosequi* on the ground of the death of the principal witness. There is nothing further to indicate personal connection of the respondent with the disposition of the case. These facts do not convince us that the respondent is guilty on this specification.

15. Another specification under paragraph 31 relates to the case of Arthur L. Stone. Stone and his wife had separated. In

1920 she retained Mr. Tufts, the district attorney for the Northern district, to obtain a divorce for her. Thereafter Stone was arrested for adultery committed in Boston, was convicted in the Municipal Court, and sentenced to both imprisonment and fine. He appealed to the Superior Court. Mr. Tufts thereupon wrote to the respondent that he was counsel for Mrs. Stone and would like to be heard before the criminal case was disposed of. The divorce case came on to be heard on June 18, 1920, but was continued for amendment and a divorce *nisi* was granted in August following. On June 23, 1920, Mr. Tufts wrote the respondent that he was no longer interested in the criminal case and on the same day a *nolle prosequi* was entered on it by an assistant district attorney without conference with the officers who were witnesses.

No justification appears for this action. The General Court has declared that appropriate cases of this nature in connection with libels for divorce should be investigated and dealt with as crimes if the court so directs. R. L. c. 152, § 41. G. L. c. 208, § 45. This case does not come within the terms of that statute because here complaint for the crime was made before the divorce was heard. There is equal reason for its prosecution and the analogy of the statute as well as the nature of the crime itself requires careful discrimination and sound judgment in the disposition of such cases. But there is nothing to show that the respondent acted from a corrupt or improper motive in taking the course which he did. He had power to enter the *nolle prosequi*. In the absence of evidence of evil purpose we find the respondent not guilty on this charge.

16. A further specification under paragraph 31 relates to the case of Charles E. Corkran. The American Woods Corporation, a foreign corporation, conducted a considerable business in Boston, where Corkran was in charge of its affairs. In 1915 the officers of his employer became suspicious of irregularities. On investigation it was found that his peculations amounted to many thousands of dollars. Boston counsel were retained, who presented the matter fully to the respondent, asking for indictment, but the latter maintained that it was a civil matter and would not take action. With his consent the matter was presented fully to an assistant district attorney, who took the same view. The case was then presented to the Municipal Court with the

consent of the assistant, where complaint was received and Cork-ran arrested and held in bail. Civil suits were begun and efforts were made for an adjustment. Then Mr. Coakley appeared as counsel for Corkran in the criminal matter. Conference was had between the attorney for the company, the respondent and Mr. Coakley, wherein the latter sought to have the respondent enter a *nolle prosequi* as to the case even though pending in the Municipal Court. At that time he declined to do so. The case was continued from time to time until November 5, 1915, when the Municipal Court declined final jurisdiction and held Corkran for grand jury action in the Superior Court on the first Monday of December, 1915. On November 11, 1915, the respondent went into the Municipal Court and entered a *nolle prosequi* on the complaint, with a statement that in his opinion it was a civil case. This is the only instance in forty years, according to the undisputed testimony of a clerk of long experience, where such an entry has been made by a district attorney in the Municipal Court. It also appears that to make that entry at that time was of special advantage to Mr. Coakley in releasing securities or money. Nevertheless, before Mr. Coakley appeared in the case, the respondent and one of his assistants had expressed the view that it was not a criminal case. The question is not whether they were right in that view. The point to be decided is whether the respondent contrary to his oath acted from improper motives. The evidence does not satisfy us that he did. We find the respondent is not guilty on this charge.

17. Still another charge under paragraph 31 is the case of Mary Fuller. This woman was convicted in the Municipal Court of fornication and of maintaining as a nuisance a house of prostitution. She pleaded guilty to the first and not guilty to the second of these complaints, and was sentenced on both. She appealed. Both her cases were nolprossed by the respondent soon after they were entered in the Superior Court without conference with the police officers in charge, who had information as to the evil reputation both of the defendant and the house. Although it now appears that the defendant was a notorious offender under another name, there is no evidence to show that the respondent knew that fact. Although unusual circumstances would be required to warrant the nolprossing of a case where there was a plea of

guilty, there is nothing further to show evil motive on the part of the respondent. We find him not guilty on this specification.

18. It is charged in paragraphs 30 and 32 that with witnesses at hand the respondent has from improper motives, wilfully or through negligence failed to introduce proper evidence or has permitted assistants to do so, in paragraph 34 that the respondent has knowingly permitted assistants to abuse the authority of his office and with knowledge of their misconduct has retained them in office, and in paragraph 35 that the respondent has knowingly permitted his assistants to fail in their duty and has retained them in office.

One of the specifications under these charges is the case of Israel Mancovitz. There was plenary evidence that this man committed numerous burglaries in Boston and stole a considerable amount of property by breaking and entering. He was bound over by a Municipal Court for action by the grand jury. The case was presented to the grand jury by Assistant District Attorney Gallagher. His manner before the grand jury had a tendency to discredit some of the material witnesses. He volunteered to the grand jury the information that the accused was a brother of another assistant district attorney and he summarized the evidence after it was closed when the grand jury were about to consider the case. All this was outside the scope of his duty and contrary to the principles of proper conduct of the grand jury. That has been pointed out earlier in this judgment and need not be repeated. He advised them that there was not sufficient evidence to warrant a conviction for breaking and entering or burglary. This was contrary to the law as applied to the facts shown to the grand jury. There was ample evidence to that effect, as he must have known. It was not for him to offer that advice. It was his duty to define the crimes. It was the province of the grand jury to determine whether the evidence convinced them that the crime had been committed. Indictments were returned in March, 1920, for receiving stolen goods. Mancovitz was arraigned on March 6, 1920. He was arrested again in May, 1920, on a warrant issued in another county. He was said by an assistant district attorney to be in an insane asylum in New Hampshire in the summer of 1920. He was convicted of a crime in New York in April, 1921, and sentenced to a term of imprisonment not yet expired. The

indictments in Suffolk County are still pending.    The evidence does not show further where he has been since March, 1920.

There are suspicious circumstances about this case, but we are not convinced on all the evidence that the respondent is proved guilty in respect of this matter.  We are not satisfied that he knew of the conduct of his assistant Gallagher with the grand jury or that there had been dereliction on his part in not bringing the defendant to trial.

19. The charges concerning the case of Alfred Soracco are failing to prosecute with sufficient evidence at hand, for knowingly permitting his assistants to abuse the authority of his office, and for knowingly retaining assistants in office with knowledge of their misconduct.  This case is a specification under paragraphs 30, 32, 34 and 35 of the information.  Soracco was charged with maintaining a common liquor nuisance in the early part of 1921.  The evidence of his guilt appears to have been overwhelming and easily accessible, as many of the witnesses were police officers and the crime a flagrant one of its kind.  In April, 1921, Assistant District Attorney Mancovitz caused a jury to be impanelled in this case and stated that the Commonwealth had no evidence and a verdict of not guilty was returned.  This was done without notification to the officer in charge of the case or conference with witnesses.  There is nothing to show that the respondent had personal knowledge of this highly reprehensible conduct of his assistant. On June 6, 1921, the police commissioner sent a letter to the respondent calling his attention to the case.  No reply was made to this letter.  The present information was filed on October 27, 1921.  There is no evidence to indicate that the respondent had personal knowledge of this case before the letter of the police commissioner to him.  Even after the receipt of the letter, there is no direct evidence to show that he knew the facts as they now appear. We are not satisfied that the defendant is shown to be guilty on this charge.

20. Another specification under paragraphs 30 and 32 of the information are the cases of Szathmary and Gederman for adultery.  They were found guilty in the Municipal Court and sentenced to imprisonment, and appealed.  There was apparently ample evidence to warrant a conviction of Szathmary on the ground of continued illicit relations with the Gederman woman.

The attorney for Mrs. Szathmary saw the respondent twice, urging trial on the ground that the male defendant was not supporting his wife and children as he ought. At first the respondent said the case should be tried the next day. Notice to that effect was given to counsel for the defendant. This was in September, 1920. That counsel was forthwith discharged and another retained, who at once associated Mr. Coakley with him. The case was not and has not been tried. Szathmary has paid almost $2,000, largely in instalments, to his new attorneys. Mrs. Szathmary, still living with her husband and fearing for the support of herself and her children, has expressed a desire not to have her husband tried. This case also presents suspicious circumstances but it may be that the respondent honestly felt that the expressed desire of Mrs. Szathmary outweighed other considerations seemingly demanding the prosecution of her husband. We are not able to find that this charge is proved against the respondent.

21. The second information consolidated with the first and treated as a part of it, charges the respondent with misconduct with reference to his office in connection with a campaign conducted by him for election as Mayor of Boston.

On November 15, 1921, the respondent in a public speech before several hundred people, relating to his candidacy for election as such mayor, used these words: "There is a dirty low-down propaganda going throughout the city that I am going to withdraw. Tell the man who tells you that that he is wrong. If he persists, tell him he's a liar. Back it up and I will nol pros your case." He concluded this address with the words, "I am not making any cheap political speech, I am giving you facts." In another public address at a different place during the same campaign, he said in substance, "Oh, no, I am not going to withdraw. If anybody tells you I am going to get out of this fight or contest, call him a liar, back it up and I will nol pros your case." These statements were not made in jest, but in earnest. They were incitements to the commission of crime by the public officer whose sworn duty it was to enforce the law, with promise of immunity from criminal prosecution by the one who had the absolute power to make his promise good.

We find the respondent guilty on these charges.

It is not necessary to decide whether this standing alone, would

be held sufficient to warrant removal. It is treated in combination with the main information.

The other charges and specifications in the information have not been presented and supported by evidence and need not be considered.

## Conclusion.

The facts found with reference to the several charges have been stated at length. All the material evidence and all the circumstances have been taken into account and weighed with care. Every presumption of uprightness, rectitude and innocence which commonly characterize the conduct of men in public station has been invoked in favor of the respondent. The compelling nature of the evidence has constrained us to make the findings stated. One conclusion alone is possible on the whole evidence. The facts carry their own mandate. It is plain. It cannot be escaped. It is imperative. The findings make clear beyond doubt that the respondent is unfit to hold longer the office of district attorney. The General Court in the lawful exercise of the power conferred upon it by the Constitution has imposed upon us the duty to remove a district attorney "if sufficient cause is shown therefor and it appears that the public good so requires." G. L. c. 211, § 4. Official corruption is sufficient cause for the removal of a district attorney. When private favoritism and personal aggrandizement are placed above principles of obvious justice and considerations of the general welfare by a district attorney, the public good requires that he be removed. No discussion is needed to demonstrate that, under the findings of fact set forth at length, no other course is open except to perform the duty of removal imposed on us by the statute. Therefore the following order is made:

Now on this twenty-first day of February in the year of our Lord one thousand nine hundred and twenty-two, by and before a majority of the Justices of the Supreme Judicial Court, namely, Arthur P. Rugg, Chief Justice, and Henry K. Braley, Charles A. De Courcy, James B. Carroll and Charles F. Jenney, Associate Justices, upon the information brought by the Attorney General of the Commonwealth against Joseph C. Pelletier, after hearing all the relevant evidence offered on behalf of those interested herein and listening to arguments, and after due deliberation and

consideration, and all and singular the premises being seen and understood and it being made to appear to said court that certain of the allegations of said information are proved to be true as set forth in the judgment filed, and that sufficient cause is shown for the removal of said Joseph C. Pelletier from the office of district attorney for the Suffolk District and that the public good requires such removal: therefore it is considered by said court, all of said Justices concurring and they being a majority of the Justices of said court, that the said Joseph C. Pelletier do not in any manner concern himself further about holding or exercising the said office of district attorney for the Suffolk District; but that he be and is hereby removed therefrom, and forejudged and excluded from holding or exercising the said office.